**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Oscar Fernando CUEVAS,**
**Defendant–Appellant.**

No. 87–5007.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 5, 1988.

Decided June 2, 1988.

Victoria B. Eiger and Nathan Z. Dershowitz, Dershowitz & Eiger, New York City, and Alan M. Dershowitz, Cambridge, Mass., for defendant-appellant.

Gordon Greenberg and Jeffrey C. Eglash, Asst. U.S. Attys., Los Angeles, Cal., for plaintiff-appellee.

Before ALARCON, FERGUSON and BEEZER, Circuit Judges.

BEEZER, Circuit Judge:

Oscar Cuevas was convicted of conspiracies to possess and distribute cocaine and to violate federal currency reporting laws. He was also convicted of 13 substantive offenses. He argues that the convictions should be reversed for insufficient evidence, nonconformity of his indictment to a Swiss extradition order and multiple trial errors. He argues that his cumulative sentences violate double jeopardy. We affirm.

FACTS

This case involves sizable currency transactions [1] between the United States and foreign countries from 1983 to 1985. The alleged purpose of the currency transactions was "laundering" [2] of profits from a United States-based narcotics conspiracy.

In October 1983, under the assumed name of "Hector Gomez," Cuevas began receiving Brinks bags labeled "promissory notes" at an address in Zurich, Switzerland.

The bags were shipped by Alvaro Lozano ("Lozano") from Miami, Florida. Seven shipments of putative "promissory notes" passed from Lozano to Gomez between November 2, 1983 and December 9, 1983. The shipments halted on December 9, 1983, when a Customs official discovered $240,000 cash in a bag labeled "promissory notes." Since Brinks did not suspect cash transport, a Currency Monetary Instrument Report ("CMIR") had not been filed. Brinks attempted to locate Cuevas at his Miami and Zurich addresses; both addresses were abandoned. [3]

In December 1983, Cuevas rented offices in Mexico City. On April 8, 1984, a courier in Cuevas' service was detained entering England; he carried a suitcase containing $177,000 cash. The courier, Rafael Onate-Serrano ("Onate") had failed to file a CMIR before transporting this cash, as required by 31 U.S.C. § 5316.

In May 1984, Onate ("Onate") and Ernesto Zawadski ("Zawadski") rented neighboring apartments in California. Zawadski then rented a second apartment in Miami. Cuevas listed the Miami apartment as his own address. Shortly after renting the Miami apartment, Zawadski and Cuevas flew to meet Carlos Guzman ("Guzman") in Los Angeles. Guzman became a cash courier for Zawadski and Cuevas.

Cuevas returned to London (alias "Gomez"). Zawadski began coordinating collection of sizable narcotics revenues in the United States, recording the transactions in a ledger, and disseminating the narcotics revenues to Guzman, Onate, and Lozano, [4] for transport to Cuevas. Telephone records indicate that Zawadski communicated regularly with Cuevas in London, often before trips by Guzman and Onate.

---

1. Concededly exceeding 19 million dollars.

2. Hereinafter "money laundering" refers to a process by which cash derived from a criminal enterprise "may be easily exchanged without a trace of [its] origin." *United States v. Varbel,* 780 F.2d 758 (9th Cir.1986). *See also* President's Commission on Organized Crime, *The Cash Connection: Institutions and Money Laundering,* at 7 (Interim Report, Oct. 1984) (" 'money laundering' is the process by which one conceals the existence, illegal source, or illegal application of

income, and then disguises that income to make it appear legitimate.")

3. No forwarding addresses had been supplied.

4. Evidence was introduced that Zawadski utilized a "beeper system" (communication system) to allow cocaine traffickers to contact him more readily. Cash couriers were instructed on how to use the communication system by Cuevas.

Cuevas purchased airline tickets and hotel reservations for Guzman and Onate, as well as for confessed courier Charles Spiteri ("Spiteri").

Between June and November 1984, Cuevas deposited at least $19 million in small denomination U.S. currency at Citibank, London. In November 1984, believing that Cuevas' deposits were illegally obtained, Citibank terminated the relationship with him. Thereafter, Cuevas deposited $4.4 million in cash at Republic National Bank, London.

Back in the United States, Zawadski collected millions of dollars in narcotics proceeds, including at least $900,000 from Ralph Mastrangelo ("Mastrangelo"). Zawadski filled a ledger with details of these narcotics transactions. The ledger indicated that Zawadski had dispatched cash couriers to London regularly for contact with Cuevas, who then "laundered" the American bills at London banks. Cuevas' London deposits were recorded in Zawadski's ledger.

Cuevas, alias "Gomez," met couriers on their arrival in London, paid them, arranged travel plans, and entertained. When couriers were intercepted,[5] they gave false and conflicting stories as to the source of cash carried.

On one occasion, courier Spiteri was given Zawadski's "beeper number" by Cuevas. Cuevas told Spiteri how to contact Zawadski when Spiteri returned to the United States.

Spiteri testified that he delivered (without CMIR's) $400,000 in cash to Cuevas on November 18, 1984 and $494,000 in cash to Cuevas on November 24, 1984. These deliveries are corroborated by Zawadski's ledger.

On November 30, 1984, Zawadski and Guzman were arrested in Los Angeles, carrying a suitcase which contained $516,-000 in small denomination United States currency. The cash was tainted with the scent of cocaine. A CMIR had not been filed for the cash.

Pursuant to a legal search warrant, an additional $1,083,000 in cocaine-tainted cash[6] was then seized from Guzman's apartment.

Cuevas immediately flew to Los Angeles from London. He met Spiteri. During the rendezvous, Cuevas explained to Spiteri that Zawadski was being pursued. Cuevas told Spiteri "the Palestinians [were] after Zawadski" because Zawadski had a document valued at "a million dollars" to "the Israelis." Spiteri was instructed that "Gomez" (Cuevas) would be recognized by "the Palestinians." On Cuevas' instruction, Spiteri proceeded to confirm Zawadski's arrest. On discovering that Zawadski had been arrested, Cuevas returned to London. Cuevas continued to receive cash from couriers, aware that Zawadski was being held on narcotics charges.

On March 23, 1985, Cuevas stated, in a sworn affidavit, that he had "never heard of" Zawadski or Guzman, and that he knew nothing of criminal charges pending against them.

On April 11, 1985, Cuevas was arrested in Zurich. Seized at the time were "beeper" numbers of active narcotics traffickers and cash couriers, a fraudulent passport (in the name of "Hector Gomez," bearing Cuevas' photograph), and CMIR's signed "Gomez."

On July 21, 1986, an extradition order issued for Cuevas. The order identified the alleged narcotics violations and currency transactions relating thereto as the basis for the extradition. The order also contained an "injunction," advising United States authorities not to prosecute Cuevas for "the fiscal aspect of the factual circumstances of the indictment." "Fiscal aspect" was not defined in the order.

On December 19, 1986, Cuevas was convicted of conspiring to aid and abet the

---

**5.** Couriers often arrived carrying unfiled, and therefore invalid, CMIRs in the name of a company ("Delta Palme") which had no legal existence; the company had been established by Lozano, with Cuevas' assistance.

**6.** The cash was packed in envelopes resembling those in which cash previously carried by Spiteri to Cuevas had been packed.

possession and distribution of cocaine, in violation of 21 U.S.C. §§ 841, 846; of willfully failing to report currency transactions in excess of $10,000, in violation of 18 U.S.C. § 371; of failing to report the export of currency in excess of $10,000, in violation of 18 U.S.C. § 2 and 31 U.S.C. §§ 5313, 5322(b); and of fraudulent concealment and false statement of a material fact within the jurisdiction of a federal agency, in violation of 18 U.S.C. § 846, 18 U.S.C. § 371, 1001, 2(a) and 2(b).

The indictment contained 15 counts. Cuevas was found guilty on all counts. Cuevas was sentenced to ten years imprisonment for count one, and five years imprisonment for counts two, three, four, five, seven, nine and thirteen. The five-year terms are to run consecutively with the ten-year term.

A second five-year term was imposed for counts six, eight, ten, eleven, twelve, fourteen and fifteen; that term was suspended in favor of probation.

Appeal is timely taken. This court has jurisdiction pursuant to 28 U.S.C. § 1291.

## I

We review de novo the alleged legal errors. *United States v. McConney,* 728 F.2d 1195, 1200–02 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). We shall reverse a jury verdict for insufficient evidence "only if no rational trier of fact could have found beyond a reasonable doubt that the defendant committed the offense in question." *United States v. Vaughn,* 797 F.2d 1485, 1489 (9th Cir.1986). The evidence must be viewed in a light most favorable to the government, *United States v. Fleishman,* 684 F.2d 1329, 1340 (9th Cir.), *cert. denied,* 459 U.S. 1044, 103 S.Ct. 464, 74 L.Ed.2d 614 (1982), and the government remains entitled to all reasonable inferences which may be drawn therefrom. *United States v. Price,* 623 F.2d 587, 591 (9th Cir.), *cert.*

*denied,* 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980).

Admission of expert testimony is a matter within broad discretion of the trial judge, not to be disturbed unless manifestly erroneous. *United States v. Fleishman,* 684 F.2d at 1335. We review denial of a continuance for abuse of discretion. *United States v. Gonzalez,* 800 F.2d 895, 898 (9th Cir.1986). We review the double jeopardy claim de novo. *United States v. Ryland,* 806 F.2d 941, 942 (9th Cir.1986).

## II

Cuevas argues that insufficient evidence was introduced to support each of his convictions.

### A

█ Cuevas argues that substantive Counts 5, 6, 8, 11, and 13 rest on insufficient proof that Guzman, a courier for Cuevas, failed to file CMIR's for international cash transfers. He states that the government's search for CMIR's on the appropriate dates omitted Guzman's name.

In fact, trial testimony of two witnesses confirmed that a thorough search was conducted for CMIR's under Guzman's name. That search covered dates on which Guzman was alleged to have exported currency. The testimony corroborated a document in evidence showing a CMIR search in Guzman's name.[7]

### B

█ Cuevas compares his conviction on substantive counts 7, 9, 12, and 14 (willful concealment of a material fact), under 18 U.S.C. § 1001, to *United States v. Woodward,* 469 U.S. 105, 105 S.Ct. 611, 83 L.Ed.2d 518 (1985). Cuevas argues that Guzman, one of his couriers, employed no "trick, scheme, or device" when he failed to file the required currency reports. Accordingly, he claims no willful concealment occurred.

---

7. A Customs officer, in whose authority CMIR searches are conducted, affirmed that a "diligent search" in Guzman's name produced no more than one currency report (CMIR). This CMIR was, in fact, filed late, only after Guzman's transport of currency on that date had been discovered.

*Woodward* does not assist Cuevas. The *Woodward* Court stated that absent a trick, scheme, or device in concealment of a material fact, a defendant's "conduct would not fall within 18 U.S.C. § 1001," *Id.* at 108, 105 S.Ct. at 612. However, the Court also noted that a "false statement" is specifically punishable under 18 U.S.C. § 1001, *id.*, and implied that the Government was not required to prove the existence of a trick, scheme or device in such instance. *Id.* at 108–109, 105 S.Ct. at 612.

In any event, circumstantial evidence, including Guzman's recurrent failure to file CMIR's for currency deliveries to Britain and Guzman's evasive behavior when detained, adequately support the inference that Guzman was participating in a deceptive "scheme." [8]

Guzman's repeated contacts with Cuevas in London (and Los Angeles) and Guzman's reliance on Cuevas for airline tickets, as well as Cuevas' continuing, intimate contacts with Zawadski—who was arrested with Guzman in November 1984—support the inference that Guzman was acting at Cuevas' direction.[9] Thus a rational juror could conclude that Guzman and Cuevas were concealing material facts from the government on the dates alleged. *See United States v. Des Jardines*, 747 F.2d 499 (9th Cir.1984).[10]

### C

■ Cuevas contends that insufficient evidence was offered to demonstrate that he knew shipments of small denomination United States currency, received from Zawadski (and earlier coordinated by Lozano from Miami and Onate from Mexico), were derived from narcotics.

There is no dispute that where a defendant knowingly facilitates movement of money derived from narcotics out of the United States for narcotics traffickers, he can be found guilty of a conspiracy to aid and abet narcotics trafficking. *United States v. Dela Espriella*, 781 F.2d 1432, 1436 (9th Cir.1986); *see also United States v. Orozco–Prada*, 732 F.2d 1076, 1080 (2d Cir.), *cert. denied*, 469 U.S. 845, 105 S.Ct. 155, 83 L.Ed.2d 92 (1984).

There is also no dispute that appellant deposited more than nineteen million U.S. dollars (in small bills) at British banks from May to November 1984, and that sufficient evidence was introduced to support the jury's finding of a conspiracy to sell narcotics.[11]

The only dispute is whether sufficient evidence was introduced to support the jury's finding that Cuevas knew that these vast quantities of small bills, which he regularly deposited at British banks, derived from the narcotics conspiracy.

Once the government has proved that a narcotics conspiracy exists, "evidence of only a *slight connection* is necessary to convict a defendant of knowing participation in it." *United States v. Arbelaez*, 719 F.2d 1453 (9th Cir.1983) (citing *United States v. Kenny*, 645 F.2d 1323, 1335 (9th

---

**8.** Moreover, Guzman made false statements of material fact to Customs officials while trafficking in currency on at least two dates. The first was in September 1984, the second in November 1984. In November, Guzman claimed to be carrying only a few hundred dollars; when his suitcase was opened in front of him, it contained $516,000 in small bills. He then falsely stated that this was his first experience transporting currency out of the United States.

**9.** Cuevas does not deny the connection to Guzman on appeal.

**10.** Cuevas argues that *Des Jardines* is inapplicable, since Guzman was not accused in the indictment of false statements on the dates for which evidence exists to prove false statements (September 1, 1984 and November 30, 1984). This is factually inaccurate. The indictment alleged false statements on both dates.

**11.** First, cash taken from Guzman and Zawadski was identified as "narcotics-scented" after a narcotics detection dog reacted to the bills. Second, Zawadski's ledger and other records comprehensively document sizable narcotics transactions, as well as sizable deliveries of narcotics-derived cash to Cuevas. Third, the "beeper system" utilized by Zawadski activated as DEA agents processed Zawadski's property; agreeing to meet a Zawadski operative, DEA agents were handed $300,000 cash in small bills, and subsequently seized cocaine and other narcotics distribution records. This is sufficient evidence of a narcotics conspiracy to uphold the jury's finding that a narcotics conspiracy existed. *See United States v. Vaughn*, 797 F.2d at 1489.

Cir.), *cert. denied,* 452 U.S. 920, 101 S.Ct. 3059, 69 L.Ed.2d 425 (1981)) (emphasis added).

Here, the requisite "slight connection" was established. Sufficient evidence was introduced to support a rational inference that appellant knew quantities of cash he deposited (and frequently wired back to the United States)[12] were derived from the narcotics conspiracy coordinated by Zawadski.

Persuasive evidence, including a detailed accounts ledger, supports the jury's finding that Zawadski was assisted by Cuevas in coordinating cocaine transactions which generated millions of dollars in revenue.[13] The ledger indicates that the narcotics revenues were systematically dispatched to Cuevas, that Cuevas immediately deposited them, and that Cuevas (often with urgency) wired them back to a city in which Zawadski resided. Telephone records indicate Cuevas regularly communicated with Zawadski.

The ledger's accuracy is corroborated by testimony of couriers who met regularly with Cuevas at a London airport and delivered messages to Cuevas from Zawadski. The ledger's accuracy is also corroborated by telephone records of contact between Zawadski and Cuevas.

Zawadski's co-conspirators testified that he was involved in promoting the cocaine business and that he knowingly received as much as $5.5 million from a single narcotics trafficker.

When cocaine traffickers (such as Mastrangelo, Mestor, Arcela) needed contact with Zawadski, they utilized the "beeper system." The record shows that Cuevas was intimately familiar details of the narcotics conspiracy, such as use of the beeper system and Zawadski's whereabouts. Cuevas gave Zawadski's "beeper number," as well as instructions on when and how to contact Zawadski, to the cash couriers. This beeper system was consistently employed by Zawadski to contact cocaine traffickers.[14]

The record also shows that Cuevas was integrally involved in and familiar with Zawadski's activities. Zawadski dispatched cocaine-derived monies through couriers Guzman,[15] Lozano, and Onate–Serrano, to Cuevas in London. The dispatches were recorded in Zawadski's ledger. Telephone calls from Zawadski to Cuevas timely preceded each cash shipment. Cash shipments between Zawadski and Cuevas originated in Miami and Los Angeles.[16] Zawadski rented an apartment in Miami. Cuevas listed Zawadski's apartment as his own personal address. Cuevas regularly wired large sums of money to Miami, generally the morning after money arrived from Zawadski. In 1984, Cuevas travelled with Zawadski. Together, they met Guzman in Los Angeles. Guzman became a knowledgable courier.

After Zawadski and Guzman were arrested on narcotics charges, Cuevas flew to Los Angeles seeking to make contact with Zawadski. Cuevas knew the location of Zawadski's apartment building. He took Spiteri there. Cuevas told Spiteri that, "Mr. Zawadski had a very special document from the Israelis" and that "the Palestinians are after him," because the document was valued at "a million dollar[s]". Implying that Cuevas might be recognized "by the Palestinians," he told Spiteri to go check to see if Zawadski was unaccompa-

12. Cuevas wired, for example, $230,000 from Citibank, London to Caribank, Miami; $50,000 from Republic Bank, London to Caribank, Miami; $1,866,000 to an American manufacturers Hanover Trust account; and $132,000 into an American Chemical Bank account. In aggregate, Cuevas wired money back to at least 29 American accounts and 14 American banking institutions.

13. Detailed deposit information on Cuevas' London Citibank account, for example, appears in the Zawadski ledger.

14. The system fortuitously activated after being seized, leading DEA officers to an additional $300,000 and a cache of cocaine.

15. Guzman himself made 39 trips in 1984–85, most into and out of Miami and Los Angeles.

16. Previous cash shipments, involving Lozano, originated in Miami. Still other cash shipments, involving Ornate, originated in Mexico City.

nied—in Mr. Spiteri's words, "because nobody knew me, but the Palestinians knew Mr. Gomez [i.e. Cuevas]...." From this account alone, a rational juror could have concluded that Cuevas deliberately fabricated Zawadski's activities to shield Spiteri from knowledge that Cuevas' was aware of Zawadski's narcotics connection.

Cuevas repeatedly gave false accounts of his activities—to bank officials, to couriers, and to law enforcement officers—on matters and in ways which strongly support the inference that Cuevas knew the nature of the illegality in which he was the pivotal international participant.

First, Cuevas adopted a false name, "Hector Gomez," when meeting with Zawadski's couriers. A rational juror could infer from this that Cuevas knew the general nature of his activities.

Second, when questioned by bank officials about the source of his money, Cuevas cryptically ascribed millions of dollars in small bills to "family coffee" and "sugar" businesses. Citibank officials testified that, in their experience,[17] commodity accounts "never" transacted business in large quantities of small denomination bills. Citibank terminated the relationship.

The one alleged expert witness which Cuevas offered (on currency laws in Colombia) could not have explained the necessity for transporting United States dollars to

Europe.[18] His other proffered Colombian witnesses demonstrated a consistent unwillingness to submit to depositions or to testify on Cuevas' behalf. Cuevas offered no credible evidence of another source—legal or illegal—for more than nineteen million U.S. dollars deposited at London banks, for payments to couriers, for intimate contact with Zawadski, for wiring money to cities in which Zawadski resided, and for making untruthful statements relating to Zawadski and to the source of the cash shipments.

Historically, the activities which Cuevas participated in and assisted in coordinating have provided strong indicia of narcotics-related money laundering.[19]

Cuevas' fabrication, surreptitious attempts to make contact with Zawadski on learning of Zawadski's narcotics arrest, knowledge of Zawadski's residence, frequent telephone calls to Zawadski, intimate knowledge of Zawadski's communication system, a shared address with Zawadski in Miami, travels with Zawadski, transfers of money to Miami, possession of narcotics traffickers' telephone and beeper numbers (which also appeared in Zawadski's ledger), and unsubstantiated, contradictory and discredited accounts of a coffee and sugar business, as well as a Colombian–United States currency laundering "business," suggest that Cuevas was intimately famil-

---

**17.** The Citibank witnesses had experience in dealing with accounts involving over 100 different commodities.

**18.** In fact, the witness was proferred to discuss Colombian "currency controls" and their connection to U.S. currency, not the exchange of U.S. currency for British or Swiss currency.

**19.** The President's Commission on Organized Crime observed:

Narcotics traffickers ... often seek to change large amounts of cash received from 'street level' sales into an ostensibly legitimate form, such as business profits or loans, before using those funds for personal benefit or reinvesting them in new narcotics purchases and distribution ... Law enforcement agencies recognize that narcotics traffickers, who must conceal billions of dollars in cash from detection by the government, create by far the greatest demand for money laundering schemes.

*The Cash Connection: Organized Crime, Financial Institutions, and Money Laundering,* at 7 (Interim Report, Oct. 1984).

The Commission further observed that, "a narcotics trafficker who wishes merely to increase the immediate portability of his cash receipts can simply exchange smaller-denomination bills (e.g., one-, five-, and ten-dollar bills) for repeatedly larger-denomination bills. [O]rganized crime today uses banks and other financial institutions as routinely, if not as frequently, as legitimate businesses." *Id.* at 8. Finally, the Commission has noted that, "[s]ome $5–$15 billion of the $50–$70 billion in illegal drug money earned in the United States probably moves into international financial channels each year." *Id.* at 13. Other indicia of narcotics trafficking identified by the Commission include setting up "shell corporate entities," using couriers to avoid filing currency reports, and converting small-denomination bills into larger-denomination bills. *Id.* at 37. Cuevas' activities include all of those mentioned.

iar with the nature of Zawadski's activities and was, therefore, a knowing participant in the narcotics conspiracy. We find the suggestion that Oscar Cuevas did not know his extensive money laundering was connected to the cocaine conspiracy overseen by his co-conspirator Zawadski untenable.

In view of Cuevas' diminished credibility,[20] his knowledge of operations extending beyond currency transactions, and his intimate relationship with narcotics trafficker Zawadski, we conclude that the requisite "slight connection" to the narcotics conspiracy has been established.

### D

Cuevas claims that insufficient evidence was introduced to support his conviction for conspiracy to avoid filing currency transaction reports with the United States government. (Counts 2, 3, 4)

Specifically, he argues that insufficient evidence was presented of currency transfers exceeding $10,000 in one day or $100,000 in a twelve month period. In addition, he claims that all parties to the indictment constitute *one* financial institution, thus no transaction was completed in or out of his institution.

Title 18, U.S.C. § 371 proscribes two or more persons from conspiring to defraud the United States government.

Title 31, U.S.C. § 5313(a) states that "[w]hen a domestic financial institution is involved in a transaction for the payment, receipt or transfer of U.S. coins or currency ... in an amount prescribe[d] ... by regulation, the institution ... shall file a report ... at the time and in the way the Secretary [of the Treasury] prescribes." (Emphasis added.)

Regulations pursuant to this statute require:

[First,] each financial institution other than a casino shall file a report of each deposit, withdrawal, exchange of currency or other payment or transfer, by,

through, or to such financial institution, which involves a transaction in currency of more than $10,000.

31 C.F.R. 103.22(a)(1); and

[Second,] [a] financial institution [is defined as] [e]ach agency, branch, or office within the United States of any person ... dealing in or exchanging currency....

31 C.F.R. 103.11(e)(3).

Finally, 31 U.S.C. § 5322(b) provides that, "[a] person willfully violating this subchapter or a regulation prescribed under this subchapter ..., while violating another law of the U.S. or as part of a pattern of illegal activity involving transactions of more than $100,000 in a 12–month period, shall be fined not more than $500,000, imprisoned for not more than 5 years, or both."

In general, we have held that, "the government must produce evidence of a physical 'transaction in currency.'" *United States v. Mouzin,* 785 F.2d 682, 690 (9th Cir.1986) (citing 31 C.F.R. § 103.11).

■ Overwhelming evidence supports the finding that individual, international transfers to Cuevas regularly exceeded $10,000. Between May and November 1984, Cuevas deposited at least $19 million in London banks. This cash in-flow disaggregates to a minimum daily deposit of $156,000, divided across that five month period. Moreover, Spiteri testified to having delivered nearly $900,000 to Cuevas in November 1984. Finally, on November 30, 1984, Zawadski and Guzman were arrested with $516,000, enroute for London; Guzman was connected to Cuevas by repeated prior visits and their close relationship with Zawadski.

In his challenges, Cuevas overlooks essential language in the relevant regulations:[21]

■ Title 31, C.F.R. § 103.22(a)(1) requires a financial institution to file a report

---

**20.** In addition to using the alias, lying to the couriers and bank officials, Cuevas initially swore in an affidavit that he had "never heard of" Zawadski or Guzman. Extensive corrobo-

rating testimony of Cuevas' co-conspirators contradicts this claim to ignorance.

**21.** 31 C.F.R. § 103.11(e)(3) and 31 C.F.R. 103.22(a)(1).

for "each ... payment or transfer by, through, or to such financial institution...." 31 C.F.R. § 103.11(e)(3) states that "[e]ach agency, branch, or office within the United States of any person ... dealing in currency ..." shall qualify as a "financial institution."

Thus, even if the transfers were between separate "branches or offices" of the Cuevas–Zawadski operation, they were transfers between legally distinct "financial institutions," and were thus subject to the reporting requirements of 31 C.F.R. 103.11(e)(3). If they were merely within the Cuevas organization, they qualified as transfers "through" the "financial institution," and were thus subject to the reporting requirements of 31 C.F.R. 103.22(a)(1).

Accordingly, sufficient evidence was presented of (1) physical currency transactions (2) exceeding $10,000 and (3) involving Cuevas' financial institution for conviction under 18 U.S.C. § 371 and 31 U.S.C. § 5313(a) (counts 2, 3, 4).[22]

### III

Cuevas claims that counts 2 through 15 must be dismissed, since he was not extradited for trial on these counts.

Citing the "doctrine of speciality" and the Swiss extradition order, Cuevas argues that he should not be held accountable for currency-related offenses, since these offenses fall within the "fiscal acts" for which prosecution was enjoined by Swiss authorities.

█ "The doctrine of 'speciality' prohibits the requesting nation from prosecuting the extradited individual for any offense other than that for which the surrendering state agreed to extradite." *Quinn v. Robinson,* 783 F.2d 776, 782 (9th Cir.1986).

The doctrine is based on principles of international comity. To guarantee limited prosecution by nations seeking extradition of persons from the United States, the United States has guaranteed, pursuant to treaty, that it will honor limitations placed on prosecution in the United States.

In cases involving Switzerland, the relevant treaty provides: "No person surrendered by either of the Contracting States to the other shall be prosecuted or punished for any offense, committed before the demand for extradition, other than that for which the extradition is granted...." *Treaty on Extradition U.S.–Switzerland,* May 14, 1900, 31 Stat. 1928, T.S. No. 354, Art. IX.

Since we observe the doctrine of "speciality," *United States v. Najohn,* 785 F.2d 1420 (9th Cir.1986), we consider the Swiss extradition order binding.

█ A person extradited may raise whatever objections the extraditing country would have been entitled to raise. *Najohn,* 785 F.2d at 1422. Accordingly, we consider the Swiss court's restrictions in the absence of a Swiss objection to the United States prosecutor's interpretation.[23]

---

**22.** Cuevas asserts that the jury instruction was confusing since it failed to "contain even a hint that it was the exchange between the customer and the financial institution that needed to be reported to prove that [exchanges in excess of $10,000 took place on a single day]."

First, as explained *supra, see Section D,* substantial evidence supports the conclusion that amounts exceeding $10,000 were transferred to Cuevas in a single day and amounts exceeding $100,000 were transferred to him between May and December 1984. Thus, transfers occurred which satisfied the statutory requirement of $100,000 within a "twelve month" period.

Second, transfers "through" the Cuevas financial institution, as well as transfers among independent "agencies, offices, or branches"—each qualifying as a "financial institution" within the meaning of 31 U.S.C. § 5313(a) and 31 C.F.R. 103.11(e)(3)—eliminate any need for discussion

of transactions between outside "customers" and the "financial institution(s)."

Finally, we evaluate jury instructions "in the context of the overall charge to the jury as a component of the entire trial process," *Bashor v. Risley,* 730 F.2d 1228, 1239 (9th Cir.1984), *cert. denied,* 469 U.S. 838, 105 S.Ct. 137, 83 L.Ed.2d 77 (1984), and reverse only if the instruction is plainly erroneous. *United States v. Nace,* 561 F.2d 763 (9th Cir.1977). The instruction was not plainly erroneous in the context of the entire jury charge and trial process. *Nace,* 561 F.2d 763.

**23.** We note that "[a]s a matter of international law, the principle of speciality has been viewed as a privilege of the asylum state, designed to protect its dignity and interests, rather than a right accruing to the accused." *Shapiro v. Ferrandina,* 478 F.2d 894, 906 (2d Cir.) (Friendly,

In this case, unfortunately, the Swiss extradition order is a study in ambiguity.[24]

■ The order clearly states that Cuevas is to be extradited on the fifteen-count indictment, including currency violation counts 2–15. However, appended to the order is "an injunction to the effect that no prosecution or punishment must take place because of the fiscal aspect of the factual circumstances of the indictment."[25] Cuevas claims that this "injunction" was intended to prevent prosecution on currency violations adjunct to the narcotics conspiracy.

The term "fiscal aspects" is not defined anywhere in the Swiss order. Other passages, however, shed light on the Swiss court's intent. On page one of the (29-page) order, the Swiss court observed that Zurich authorities had opened two cases against Cuevas, one "because of financing illegal activities in narcotics trading," a second "for collection of wrongfully obtained capital gains."

The second prosecution, relating to taxes, provides the most obvious referent for the term "fiscal aspects."

Such a construction of "fiscal aspects" (relating to taxes or financial penalties) is supported by the following central, but ambiguous passage of the extradition order:

> In order to obviate any misunderstanding whatsoever, it should be reiterated here nevertheless, that the prosecution of complainant remains admissible to the full extent of the indictment because of his activity in connection with drugs, so that, in any event, the money hauls effected by couriers acting under his orders would—from this visual angle—not have to remain without consideration. The order will have to state only that with regard to these hauls, no taxes or fees or any fiscal penalties shall be imposed as well as that if there is any penalty for the non-fiscal delict conduct, same shall not be increased in consideration of the fiscal set of facts.

From this passage, we cautiously extract the following conclusions: First, the Swiss do not oppose "prosecution ... to the full extent of the [fifteen count] indictment." Second, the "money hauls" or transactions of currency derived from narcotics should not "remain without consideration;" that is, they *should be* considered. Third, prosecution for the "hauls" themselves should not lead to the payment of "taxes or fees or any fiscal penalties"; nor should "taxes, fees, or fiscal penalties" relating to the "money hauls" be imposed surreptitiously through narcotics conspiracy penalties. Such a reading is consistent with the definition of "fiscal aspects" as tax-related.[26]

The order also acknowledges that counts 2–15 involved "transporting proceeds from drug dealings without a permit," suggesting that the Swiss court never intended to sever the currency violation counts from the narcotics conspiracy count. With specific reference to "drug money laundering," defined in the order as "the supplementary investing, transporting [hauling and] changing of monies derived from the drug trade," the Swiss court states that it is "not inclined ... to interpret ... [language relating to drug trade] financing in a restrictive way."[27]

---

J.), *cert. dismissed,* 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973); *see also United States ex rel. Donnelly v. Mulligan,* 76 F.2d 511 (2d Cir.1935); *Demjanjuk v. Petrovsky,* 776 F.2d 571, 583–84 (6th Cir.1985), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312 (1986); *Berenguer v. Vance,* 473 F.Supp. 1195, 1197 (D.D.C.1979). We, however, adhere to the opposing position, allowing petitioner to raise claims which might have been raised by the asylum state. *Najohn,* 785 F.2d at 1422.

**24.** The order was either drafted without a robust understanding of American syntax or was subject to awkward translation.

**25.** Language taken from the Swiss Extradition Order.

**26.** Specifically, financial penalties for illegal "capital gains."

**27.** In addition, Cuevas claims that, in the absence of proof that he financed the conspiracy, he cannot be prosecuted within the meaning of the Swiss extradition order, since the indictment was based, in part, on this assertion. Ample evidence supports the finding that Cuevas repeatedly transferred large sums of money from Europe to the United States, supporting the inference that he assisted in financing the

Since the appropriate test is whether the extraditing country would consider the acts for which the defendant was prosecuted as independent from those for which he was extradited, *United States v. Paroutian*, 299 F.2d 486, 491 (2d Cir.1962), and since the Swiss court consistently characterizes the narcotics and currency reporting conspiracies as integrally related, we hold that the doctrine of "speciality" is not violated by Cuevas' conviction on counts 2–15.

## IV

■ Cuevas argues that expert testimony of a government Customs agent allowed hearsay evidence to prejudice the verdict.

We do not disturb a trial court's ruling on expert testimony unless that ruling is manifestly erroneous. *Fleishman*, 684 F.2d at 1329.

The record indicates that Agent Marcello was an expert in his field[28] and that his testimony was cumulative, presenting a summary of admitted evidence and referring to information within his special knowledge as a DEA and Customs agent. We have recently permitted summary testimony under similar circumstances. *United States v. Marchini*, 797 F.2d 759, 765 (9th Cir.1986), *cert. denied*, — U.S. —, 107 S.Ct. 1288, 94 L.Ed.2d 145 (1987).

Although the agent appears to have relied on hearsay testimony in formulating a portion of his expert opinion, such a reliance does not require reversal. *See* Fed. R.Evid. 703; *see also United States v. Sims*, 514 F.2d 147 (9th Cir.), *cert. denied*, 423 U.S. 845, 96 S.Ct. 83, 46 L.Ed.2d 66 (1975). Since the evidence of narcotics and currency transaction conspiracies is overwhelming, even absent the agent's testimo-

ny, we find that any possible prejudice was harmless.

## V

Cuevas argues that the trial court abused its discretion by refusing to grant a second continuance, by refusing to grant a late request to take foreign depositions, and by excluding a witness on Colombian currency law.

### A

■ We review denial of a continuance for "clear abuse of discretion." *United States v. Gonzalez*, 800 F.2d 895, 898 (9th Cir.1986). Since Cuevas does not make a "specific showing of prejudice," *Polizzi*, 801 F.2d 1543, 1559; *Gonzalez*, 800 F.2d at 898, and since continuances are generally not favored in the absence of "compelling reasons," *Morris v. Slappy*, 461 U.S. 1, 11, 103 C.Ct. 1610, 1616, 75 L.Ed.2d 610 (1983), denial of the second continuance does not constitute an abuse of discretion.

### B

Denial of a request to take foreign depositions[29] is reviewed for abuse of discretion. *United States v. Peterson*, 812 F.2d 486, 494 (9th Cir.1987).

Cuevas was arrested in April 1985, indicted in September 1985, and arraigned in June 1986. His first trial date was set for July 22, 1986. The government tendered most discovery material by June 12, 1986.

When Cuevas requested a continuance to seek foreign depositions and prepare pretrial motions, the court granted his request. The court set a second trial date for September 2, 1986. That date, at the government's request, was made firm to

---

conspiracy. Second, the Swiss order states that, although Swiss law "require[s] an exact presentation of the offense the defendant is being charged with . . ., the question is not that the act of crime . . . would have to be proven."

Finally, the Swiss court implied that the acts Cuevas now terms "unlawful fiscal acts [i.e. export of foreign currency without a permit . . .]" were not acts of a "fiscal nature." Alternatively, if such acts were of a "fiscal nature," the order states that the "fiscal aspect" was "shed-

ding much of its importance . . . [in light of] the entire series of facts being the subject of the extradition."

**28.** Agent Marcello had arrested 135 domestic narcotics violators and 99 international couriers in narcotics currency during 13 years with the DEA and 2 years with U.S. Customs; he had assisted in the arrest of over 400 narcotics smugglers in 15 years of law enforcement.

**29.** See Fed.R.Crim.P. 15(a).

guarantee commitments from the government's foreign witnesses.

Five days before trial, Cuevas requested a second continuance and leave to take foreign depositions.

In light of unexplained reticence among Cuevas' witnesses to testify on his behalf, the inconvenience to foreign government witnesses of repeated rescheduling, Cuevas' extended opportunity for depositions prior to his second request for continuance, the government's prompt response to discovery, and death threats against government witnesses, the trial court did not abuse its discretion in denying Cuevas' late request to take foreign depositions.

### C

■ The decision not to permit an expert witness to testify will not be disturbed unless manifestly erroneous. *United States v. Langford*, 802 F.2d 1176, 1179 (9th Cir.1986). A trial judge has considerable discretion in determining whether the jury will be assisted or confused by the proffered testimony.

Cuevas offered an "expert" witness without evidentiary foundation. The witness admitted possessing no knowledge of currency laws or transactions involving London, Zurich and the United States, no knowledge pertaining to "money laundering," and no knowledge of Cuevas or of Cuevas' activities. The witness was proffered to testify only on currency exchange law in Colombia. The trial judge found this proposed testimony not relevant and also potentially confusing. On review of the record, we cannot conclude that the district court's finding was manifestly erroneous. *Langford*, 802 F.2d at 1179.

### VI

■ Cuevas argues that, by imposing cumulative sentences for narcotics and currency reporting conspiracies, the trial court violated his Fifth Amendment right against double jeopardy.

While proof of Cuevas' two conspiratorial crimes overlaps substantially,[30] the test set out in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932), for establishing a violation of double jeopardy has not been met.

The Supreme Court has held that, "notwithstanding a substantial overlap in the proof offered to establish the crimes," *Albernaz v. United States*, 450 U.S. 333, 338, 101 S.Ct. 1137, 1142, 67 L.Ed.2d 275 (1981); *see also United States v. Gonzalez*, 800 F.2d at 897, two offenses are not the same offense for double jeopardy purposes if "each provision requires proof of an additional fact which the other does not." *Blockburger*, 284 U.S. at 304, 52 S.Ct. at 182; *United States v. Ryland*, 806 F.2d at 942–43.

The narcotics conspiracy alleged in count 1, 21 U.S.C. §§ 841, 846, required proof, inter alia, of intent to possess and to distribute cocaine.

The currency transactions conspiracy alleged in count 2, 18 U.S.C. § 371, required proof, inter alia, of unreported currency transactions exceeding $10,000 a day, $100,000 in a twelve-month period, and knowing transportation of currency out of the United States.

Thus, count 2 did not require proof of intent to possess or distribute cocaine, and count 1 did not require proof of unreported currency transactions exceeding $10,000 a day or $100,000 in a twelve-month period. Nor did count 1 require proof of knowing transportation of currency out of the United States. Consequently, neither count is a lesser included offense of the other.

For the opposing proposition, Cuevas refers this court to *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969); *United States v. Solano*, 605 F.2d 1141, 1144 (9th Cir. 1979); and *United States v. Castro*, 629 F.2d 456, 461 (7th Cir.1980). In each of these cases at least one of two convictions did not "require[ ] proof of an additional fact" to secure the other. *Blockburger*,

---

**30.** Permitting them to be closely related for the purposes of the Swiss extradition order.

**1430**

284 U.S. at 304, 52 S.Ct. at 182.[31] In this case, the same cannot be said. The double jeopardy clause is not violated by Cuevas' cumulative sentences.

## VII

Sufficient evidence supports each count on which Cuevas was convicted. Applying the doctrine of "speciality," we conclude that Cuevas was not tried on any charge for which he was not extradited. Expert testimony introduced against Cuevas was neither unfairly prejudicial nor otherwise impermissible. The trial court's denial of Cuevas' second request for continuance, denial of leave to take foreign depositions, and exclusion of Cuevas' witness on Colombian currency law do not represent manifest error. Cuevas' cumulative sentences, evaluated under the *Blockburger* test, do not violate double jeopardy.

AFFIRMED.

FERGUSON, Circuit Judge, dissenting:

I disagree with the majority's conclusion that the district court did not abuse its discretion by refusing to allow Cuevas' expert witness to testify, and therefore I dissent.

Cuevas was charged with violating narcotics and currency reporting laws. The district court found that the testimony of an expert witness proffered by Cuevas would be irrelevant to the issues in the case and would not help the jury reach a verdict. Given the facts at issue in the case, however, the testimony was clearly relevant and material to Cuevas' defense. Thus the district court's conclusion could only have been predicated on an assumption favoring the government, which resolved a key disputed fact. This violates foundational principles of our system of justice, grounded in the Fifth and Sixth

Amendments of the Constitution: that the defendant has the right to present a defense to the charged offenses, and that the defendant has the right to present the testimony of favorable witnesses. Cuevas was denied these rights, and he is entitled to a new trial.

While the district court has broad discretion to determine whether evidence is relevant, that discretion "is limited by the [defendant's] due process right to present a defense and his Sixth Amendment right of confrontation." *United States v. Whitman*, 771 F.2d 1348, 1350 (9th Cir.1985).

> The right to offer the testimony of witnesses ... is in plain terms the right to present a defense, the right to present the defense's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967); *see also Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations. The right[] ... to call witnesses in one's own behalf [has] long been recognized as essential to due process."). Thus, "criminal defendants have ... the right to put before a jury evidence that might influence the determination of guilt." *Pennsylvania v. Ritchie*, 480 U.S. 39, 107 S.Ct. 989, 1001, 94 L.Ed.2d 40 (1987) (footnote and citations omitted).[1]

The narcotics conspiracy charge against Cuevas was based on allegations that he

---

**31.** Reliance on *Jeffers v. United States,* 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977), is similarly misplaced. The *Jeffers* Court failed to reach the question whether the two cumulative prison sentences violated double jeopardy. *See also, United States v. Ryland,* 806 F.2d at 942.

**1.** We have previously recognized this right in holding that the Sixth Amendment guarantee of compulsory process for obtaining the testimony of favorable witnesses, "prevents the state from arbitrarily excluding such testimony." *Perry v. Rushen,* 713 F.2d 1447, 1450 (9th Cir.1983), *cert. denied,* 469 U.S. 838, 105 S.Ct. 137, 83 L.Ed.2d 77 (1984).

made numerous currency transactions as part of a scheme to launder drug money. It must be remembered that currency exchange is not illegal per se. *United States v. Dela Espriella*, 781 F.2d 1432, 1436 (9th Cir.1986) ("money laundering itself is not a crime, and the mere fact that a person launders monies derived from narcotics activities does not make the launderer part of a conspiracy to violate the narcotics laws."); *cf. United States v. Orozco–Prada*, 732 F.2d 1076, 1081 (2d Cir.), *cert. denied*, 469 U.S. 845, 105 S.Ct. 155, 83 L.Ed.2d 92 (1984).

Cuevas' defense was that he was engaged in a legitimate currency exchange service for Colombian businesses. Cuevas sought to put before the jury the testimony of a witness, Professor Gerald Nickelsburg, with expertise in the currency controls of South American countries and the international transactions necessitated by those controls. This testimony was material to establishing Cuevas' defense that the laundered funds had a non-narcotic origin. The district court, however, determined that the witness' intended testimony was irrelevant.

The district court concluded that the testimony Nickelsburg would give was irrelevant because "this case involves only money transactions in the United States, the United Kingdom and Switzerland. There has been no evidence of any money transactions originating in any of the South American Latin American countries."

Aside from the inaccuracy of the judge's latter statement,[2] the location of the transactions is neither the only, nor the only significant, fact in this case. Proof that the money was derived from drug sales, and that the defendant had knowledge of that fact, were relevant to at least four counts in the indictment.[3] Thus, it was the government's theory that Cuevas knowingly exchanged currency derived from the sale of illicit drugs in the United States.[4] Ergo, while the reporting violations may have occurred in the United States and Europe, the impetus for the currency transactions—since it would be indicative of Cuevas' knowledge and intent as to the origin of the money—was unavoidably a central issue in the case.

The majority concludes that the expert witness proffered by Cuevas "could not have explained the necessity for transporting United States dollars to Europe." At a minimum, this is a speculative conclusion since the witness was never given an opportunity to explain Colombian currency controls, which could render such transport a means of easing compliance with those controls. At a maximum, the conclusion is totally erroneous because defense counsel offered Nickelsburg to testify about legal activities with regard to the purchase of currencies, the access of South American businesses to United States currency within countries such as Colombia where currency controls exist, why those controls necessitate obtaining cash from companies

---

2. At least one witness, Patricia Villa, testified regarding currency transactions that originated in Colombia.

3. The drug "connection" is arguably essential to all counts. The Swiss extradition order precludes prosecution on purely "fiscal" matters. This arguably would include offenses focused on currency exchange transactions lacking a tie to illicit narcotics activities.

4. In supporting its decision, the majority often refers to Mr. Zawadski, allegedly a key operative in a complex scheme to launder money derived from the sale of cocaine in the United States. In this regard, the majority implies that Zawadski was Cuevas' "right-hand man", acting at Cuevas' direction. Such suggestions constituted an essential part of the government case that Cuevas had knowledge of and intent to further a criminal narcotics conspiracy. It is noteworthy, however, that Zawadski was not presented as a witness by the prosecution at Cuevas' trial. In his own prosecution, Zawadski consistently maintained that he did not know that some of the money he transported came from drug sales. Thus the government was unable to show that Zawadski had ever stated or even implied that Cuevas had knowledge that any of the currency he exchanged had illicit origins. Moreover, none of the witnesses presented at trial testified that they had ever discussed with Cuevas or overheard him speak of the money having illicit origins. In fact, there was no direct evidence offered at trial that Cuevas had culpable knowledge or intent.

and locations outside of those countries, the manner in which U.S. currency can be obtained for those companies, as well as general business policies in Europe as they relate to South American countries and businesses.[5] Thus, Nickelsburg could have provided a legitimate and non-criminal explanation for Cuevas' currency exchange activities.[6] By excluding Nickelsburg's testimony, the district court deprived Cuevas of his fundamental right to defend against the offenses alleged in his indictment.

While "some constitutional errors ... are so unimportant and insignificant that they may ... be deemed harmless, not requiring the automatic reversal of the conviction," *Chapman v. California,* 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967), the constitutional violations in this case are fundamental. I would reverse Cuevas' conviction and remand for a new trial.

---

**5.** In addition, the majority states that other than the expert witness, "Cuevas offered no credible evidence of another source—legal or illegal" for his activities, and implies that this is further evidence of his guilt. The majority thus finds significance in a dearth of evidence that there was a nonnarcotic source for the money exchanged under Cuevas' direction. Cuevas attempted to present his defense—that he was engaged in a legitimate currency exchange service because Colombian currency restrictions encouraged such exchange, and that he understood the money he exchanged to have been proceeding from legitimate Colombian businesses—but was prevented from doing so by the district court.

**6.** Establishing a specific criminal impetus for the currency transactions lies at the heart of the conspiracy offense. Nickelsburg was to have testified regarding one reason for the events and transactions that the government alleged to be part of a criminal conspiracy. However, the court did allow, over objection, testimony regarding a different explanation for the transactions from the government's expert witness. The witness, DEA Agent Marcello, testified as to the common operations and methods of narcotics money laundering. The district court's determination that Nickelsburg's testimony was irrelevant could only have been made if it first assumed that that the origin of the funds and reason for their exchange had been established, i.e., that Cuevas was not engaged in legitimate currency exchange, but rather knowingly facilitated the laundering of money derived from drug sales in the United States. That the court in fact made such an assumption is supported by its allowing Marcello's, but not Nickelsburg's, testimony.