**In the Matter of the EXTRADITION OF Giancarlo Formichi MOGLIA.**

**Misc. No. 92–00138 ACK.**

United States District Court, D. Hawaii.

Feb. 26, 1993.

Marshall Silverberg, Asst. U.S. Atty., D. Hawaii, Honolulu, Hawaii, for Italy.

Donna Gray, Asst. Federal Public Defender, Honolulu, Hawaii, for defendant.

## ORDER CERTIFYING THE EXTRADITABILITY OF GIANCARLO FORMICHI MOGLIA

KURREN, United States Magistrate Judge.

On January 26, 1993, this court held an extradition hearing pursuant to 18 U.S.C.

---

§ 3184 regarding the request by Italy to extradite Giancarlo Formichi Moglia ("Moglia") for violation of Italian narcotics laws.[1] Assistant United States Attorney Marshall Silverberg represented Italy and Donna Gray, Assistant Federal Public Defender, represented Moglia. The court having reviewed and considered the documents and affidavits submitted by Italy, the testimony of the witnesses presented at the extradition hearing and the memoranda and oral arguments of counsel, hereby certifies the extraditability of Moglia to the Secretary of State of the United States on the charged offenses.

## I. INTRODUCTION

On October 13, 1992, in accordance with Article XII of the Extradition Treaty Between the Government of the United States of America and the Government of the Republic of Italy, October 13, 1983, T.I.A.S. No. 10837, *reprinted in* 24 I.L.M. 1525 ("the Treaty") (a copy of the Treaty was received in evidence as Exhibit A), Moglia was arrested at the Honolulu International Airport at the request of Italy.

On November 18, 1992, pursuant to Article X of the Treaty, the Italian Government presented through diplomatic channels a formal request for Moglia's extradition.[2] On November 25, 1992, Italy filed a Memorandum of Law in support of its extradition request, including numerous documents identified as Exhibits A through F. On November 30, 1992, Italy filed a Supplemental Memorandum of Law, including Exhibit G. On January 7, 1993, Moglia filed a Memorandum of Law in Opposition to Italy's Extradition Request. On January 25, 1993, Italy filed a Reply Memorandum, including Exhibits H, I, J, K1, and K2. All of the exhibits were received in evidence at the hearing.

Italy alleges that: (1) Moglia (in association with others) possessed, imported, transported and distributed 600 kilograms of cocaine into and in Palermo, Italy; and (2) Moglia conspired with others to aid and abet narcotics trafficking by facilitating the movement of money derived from the shipment of the 600 kilograms of cocaine described in Count 1. Italy wants to extradite Moglia to stand trial for these two charges. Moglia is opposing the extradition request.

## II. EXTRADITABILITY REQUIREMENTS

Before extradition may be certified, the court must be satisfied that the following elements have been established:

(1) that there is an extradition treaty in force between the United States and Italy;

(2) that Italy has "charged" Moglia with one or more crimes (*see* Article I of the Treaty);

(3) that a certified copy of the arrest warrant or any order having similar effect has been presented to this court (*see* Article X, ¶ 3(a));

(4) that the crimes for which he is charged are extraditable offenses within the terms of the Treaty (*see* Articles I and II of the Treaty);

(5) that the evidence submitted established a reasonable basis to believe that Moglia committed the charged offenses, (*see* Article X, ¶ 3(b)); and

(6) that the individual before the court is the same person who is charged in Italy (see Article X, ¶ 3(c)). *See, e.g., Extradition of Suarez–Mason,* 694 F.Supp. 676, 685 (N.D.Cal.1988) (*citing Extradition of Kraiselburd,* 786 F.2d 1395, 1399 (9th Cir. 1986) and *Caplan v. Vokes,* 649 F.2d 1336, 1343 (9th Cir.1981).

## III. FINDINGS OF FACT AND CONCLUSIONS OF LAW

1. *There Is An Extradition Treaty In Force*

The court finds that the submission of Italy establishes the existence of an extra-

---

1. By order dated November 16, 1992, Chief United States District Judge Alan C. Kay assigned the matter to this court.

2. A copy of the diplomatic note asking the United States to extradite Moglia is attached to the affidavit of Thomas A. Johnson, Attorney Advisor in the Office of the Legal Advisor for the United States State Department. Mr. Johnson's affidavit was received in evidence as part of Exhibit A.

dition treaty in force between the United States and Italy. Moglia does not dispute this finding.

### 2. Moglia Has Been Charged Within The Meaning Of The Treaty

There has been a dispute as to whether or not Moglia was in fact "charged" within the meaning of the treaty. Before Moglia arrived in the United States, he was found residing in Australia, and Italy attempted unsuccessfully to extradite him from that country. The extradition request was denied because the Australian court determined that the arrest warrant issued on February 18, 1992, was for investigative purposes only and that Moglia had not in fact been "charged" within the meaning of the treaty. However, following the Australian extradition proceeding, on October 20, 1992, the Italian prosecutor, Dr. Sciacchitano, requested Moglia's commitment for trial (Exhibit C at 424–26). There is no dispute that under Italian law once a prosecutor asks the court for a person's commitment for trial, that person has been "charged" within the meaning of the treaty.[3]

### 3. There Is A Certified Copy Of The Arrest Warrant

The third element—whether a certified copy of the arrest warrant has been presented—also is not in dispute. The arrest warrant was issued on February 18, 1992, and a certified copy of it was received as Exhibit B.

### 4. The Dual Criminality Requirement Has Been Satisfied

The Treaty at Article II defines "extraditable offenses." According to its provisions, an offense is extraditable only if it is a felony offense under the laws of both Italy and the United States, i.e. punishable by more than one year imprisonment. In addition to making all criminal acts extraditable if they are felonies in both Italy and the United States, the treaty also provides that any type of association or conspiracy to commit such felony is an extraditable offense. Article II, ¶ 2.

■ Article II is a standard provision that is contained in most extradition treaties. It represents a maxim of international law known as "dual criminality." The rule of dual criminality means that extradition will not take place unless the offense charged is a crime in both the demanding and the requesting country.

■ Moglia does not challenge that the first offense charged—the importation and distribution of 600 kilograms of cocaine into and in Italy is in violation of Article 71 of Italian law (see Exhibit B at 58)—and would be a crime if it had occurred in the United States. See 21 U.S.C. §§ 841, 959. Rather, Moglia's argument is that there is no evidence that the second charge—regarding the laundering of the proceeds of the distribution—is a crime in Italy (while conceding it would be a violation of United States money laundering laws) (Op.Mem. 10).

In considering this issue, it must be noted initially that the courts have interpreted the dual criminality provision very liberally as not requiring an identical counterpart in each jurisdiction. In other words, "[d]ual criminality requires only that the acts alleged constitute a crime in both jurisdictions." *Bozilov v. Seifert*, 967 F.2d 353, 355 (9th Cir.1992) (citation omitted). "Each state may name and penalize the crime differently." *Id.*

Here, Moglia in fact mischaracterizes the second offense with which he is charged. The second charge alleges that Moglia was part of a criminal *association* (or conspiracy) of more than ten individuals that engaged in the substantive drug offenses as set forth in the first charge. *See* Exhibit D. Moglia's role, as part of the conspiracy, allegedly was to launder the proceeds of the sale. *Id.* Thus, although Moglia allegedly engaged in money laundering as part of a narcotics conspiracy, he has not been

---

**3.** Thus, although there remains a dispute as to whether Moglia was "charged" by the issuance of the arrest warrant back on February 18, 1992, it is unnecessary for the court to reach that issue, and it chooses not to do so.

charged with the substantive crime of money laundering.

The Italian statute allegedly violated is Article 75 of Law No. 685 (Exhibit B at 60) which proscribes three or more persons from conspiring together for the purpose of committing the substantive drug offenses set forth in Article 71. *See* Exhibit B at 60, ¶ 1. And, if there are more than ten persons involved, as there are in this case, then the fourth paragraph of Article 75 provides for enhanced penalties. *Id.* at ¶ 4. That is why the second count specifically alleges that Moglia was part of an association or conspiracy in violation of Article (or "Section") 75, paragraphs 1, 2, and 4, that committed the substantive offenses set forth in Article (or "Section") 71.

It is clear that a violation of Article 75 is an extraditable offense. Indeed, such an extraditable offense is specifically referred to in Article II of the Treaty: "[a]ny type of association to commit offenses described in paragraph 1 of this Article [concerning any felony], as provided by the laws of Italy, and conspiracy to commit an offense described in paragraph 1 of this Article, as provided by the laws of the United States, shall also be extraditable offenses." Article II (*see* Exhibit A).

■ Moreover, the inquiry concerning the "dual criminality" requirement focuses solely on whether the alleged *acts* were felonies under the laws of both Italy and the United States, and not whether both countries have the same laws. *See Bozilov v. Seifert,* 967 F.2d 353, 355 (9th Cir.1992). Here, the second count charges that the acts committed by Moglia included participating in a criminal association by "carrying on continual money laundering activities on behalf of the other defendants having been sent up for trial and doing [his] best to obtain profits from narcotics trafficking to the advantage of Colombian groups in Palermo, Milan, New York, Los Angeles, Geneva, and other cities, from the second half of 1987." *See* Exhibit D.

Not only are such activities illegal in Italy, they are also illegal in the United States. Here, an agreement to engage in actions that are integral to the success of a narcotics enterprise—such as laundering illicit proceeds—violates 21 U.S.C. § 846 as a conspiracy to aid and abet the distribution of controlled substances. *See United States v. Cuevas,* 847 F.2d 1417, 1422 (9th Cir.1988) ("There is no dispute what where a defendant knowingly facilitates movement of money derived from narcotics out of the United States for narcotics traffickers, he can be found guilty of a conspiracy to aid and abet narcotics trafficking."); *United States v. Dela Espriella,* 781 F.2d 1432, 1436 (9th Cir.1986).

In the United States, and now in Italy, the laundering of drug proceeds is a substantive offense. But at the time the acts were allegedly committed by Moglia, Italy had not yet made money laundering a substantive offense. If Moglia had committed these alleged acts in the United States before the money laundering statute (18 U.S.C. § 1956) was enacted on October 27, 1986, then he could have been charged with conspiring to aid and abet the narcotics offense. *See, e.g., United States v. Cuevas, supra,* 847 F.2d at 1422; *United States v. Dela Espriella, supra,* 781 F.2d at 1436. And because he has been so charged in Italy, and Article 75 of the Italian law clearly covers this type of activity, the dual criminality requirement has been satisfied.

This court finds, therefore, that the acts allegedly committed by Moglia, which form the basis for Count 2, are prohibited by Article 75 of Italian Law No. 685 and if committed in the United States would be a violation of the narcotics conspiracy statute, 21 U.S.C. § 846. Thus, the dual criminality requirement has been satisfied.

### 5. *There Is Probable Cause For Both Offenses*

The fifth element—whether there is probable cause to believe that Moglia committed one or both offenses—is also being contested. In considering whether Italy has satisfied its probable cause burden, this court makes note of the following legal principles.

**1442**

First, the extradition hearing is not used to determine whether the evidence is sufficient to justify conviction, *Collins v. Loisel*, 259 U.S. 309, 316, 42 S.Ct. 469, 472, 66 L.Ed. 956 (1922), for that determination will be made by the foreign court which ultimately tries the defendant. *Jhirad v. Ferrandina*, 536 F.2d 478, 484–485 (2d Cir.) *cert. denied*, 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976).[4] "Indeed, a judicial officer need not 'predict that a foreign court would convict [the fugitive].'" *Spatola v. United States*, 925 F.2d 615, 618 (2nd Cir.1991) (citation omitted).

Rather, "[i]n an extradition proceeding, the [United States] magistrate need only 'determine whether there is competent evidence to justify holding the accused to await trial, ... not ... whether the evidence is sufficient to justify a conviction.'" *Bozilov v. Seifert, supra*, 967 F.2d at 356 (*quoting Collins v. Loisel*, 259 U.S. 309, 316, 42 S.Ct. 469, 472, 66 L.Ed. 956 (1922)). The probable cause standard is used in making that determination. *Fernandez v. Phillips*, 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925); *Glucksman v. Henkel*, 221 U.S. 508, 511–12, 31 S.Ct. 704, 705, 55 L.Ed. 830 (1911); *Bozilov v. Seifert, supra*, 967 F.2d at 356; *Mirchandani v. United States*, 836 F.2d 1223, 1226 (9th Cir.1988); *In re Extradition of Russell*, 789 F.2d 801 (9th Cir.1986); *Quinn v. Robinson*, 783 F.2d 776, 783 (9th Cir.1986). "The probable cause standard applied in extradition proceedings is defined in accordance with federal law and has been described as 'evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt.'" *In re Extradition of Suarez–Mason*, 694 F.Supp. 676, 686 (N.D.Cal.1988) (*quoting United States v. Wiebe*, 733 F.2d 549, 553 (8th Cir.1984)).

### A. The Facts In This Case

In this case, probable cause to believe that Moglia did in fact engage in such activities is derived from the following sources: (1) an accomplice named Giuseppe Cuffaro who was actively involved in the shipment of the cocaine and who was a witness to the laundering of the proceeds; (2) Boris Sanchez, a cousin of one of the principals, Angel Sanchez, who corroborated key portions of Cuffaro's statements; (3) Giuseppe Lottusi, who, along with Moglia, was deeply involved in laundering the proceeds from the cocaine; (4) Enzo Coltamai, the deputy manager of a Swiss bank called FIMO, who transferred large amounts of cash from Lottusi to another Swiss bank called the Trade Development Bank which had an account belonging to Oficina De Cambio International ("ODCI"), a company whose Swiss representative was Moglia; (5) bank records from FIMO and the Trade Development Bank that prove that Lottusi deposited more than $10 million in cash in FIMO and then Coltamai transferred it to ODCI's account at the TDB where Moglia and his accomplice Rose Kirby then withdrew the money and transferred to banks in New York on the way to Venezuela and then perhaps back to Moglia in Los Angeles; (6) ship records that prove that a ship named "Big John" did in fact berth in Palermo on January 21, 1988 (after first docking in Malta) as stated by Cuffaro; (7) hotel records that establish that Angel Sanchez and Waldo Aponte Romero, the Colombian representatives in the transaction, were in fact in Palermo on January 16, 1988 when "Big John" docked; (8) a Customs Service investigation that showed that Moglia, RCG Enterprises, and ODCI in Los Angeles received more than $42 million in small bills around the same time period that the proceeds from the 600 kilgrams of cocaine were being laundered; (9) a cooperating witness who told the FBI that he personally viewed Moglia engaging in money laundering activities in Los Angeles and who sold Moglia 750 grams of cocaine for $23,000; (10) FBI interviews with employ-

---

**4.** In *Jhirad* the court noted:

It is well to remember that Jhirad's culpability will not be determined in the United States. It is not the business of the courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation. Such an assumption would directly conflict with the principle of comity upon which extradition is based. *Id.* at 484–85.

ees of Brinks, a company that uses armored cars to transport cash, who stated that Moglia's company RCG Enterprises and ODCI used the same offices in Los Angeles, that they frequently transported large amounts of currency in small denomination bills for RCG and ODCI, and that the manager of RCG Enterprises, Moglia's stepson Michael Meditash, acknowledged that one could infer that the money was derived from narcotics trafficking; and (11) the wire-tapping of Lottusi's telephone, which includes the tape recording of a 1991 telephone call in which Moglia and Lottusi discussed their past business relationship and Moglia requested that he and Lottusi reestablish such a business. Each of these factors is part of the factual underpinnings for probable cause and is discussed separately below.

### (1) *Giuseppe Cuffaro*

Joseph Cuffaro, who is presently in the American witness protection program, described the cocaine transaction as follows. In 1970 he met a person named John Galatolo in Brooklyn, New York. (Exhibit C at 64). In 1983, Cuffaro again met Galatolo, this time in Miami, and they became friends. *Id.* At the end of 1984 or the beginning of 1985, Galatolo suggested that Cuffaro use his factory, called the Scirooco Fan Company, as a place where Galatolo could ship cocaine. *Id.* As a reward, Cuffaro would receive $500 for every kilogram of cocaine shipped to the factory. *Id.* Cuffaro agreed.

In 1986/1987 Galatolo returned from a trip to Palermo, Italy and told Cuffaro that he had become officially a member of the Mafia and that he had been assigned the task of dealing in drugs. *Id.* From 1986 until the middle of 1987, Cuffaro, with the assistance of Galatolo, participated directly in a series of deliveries of cocaine from Florida to New York. *Id.* The consignees of the deliveries were Joe Gambino and other members of the Sicilian Mafia. *Id.* In 1986 Galatolo also told Cuffaro that he had received instructions from his godfather in Sicily, Francesco "Ciccio" Madonia, to prepare a new shipment of cocaine from Colombia to Sicily. *Id.* Cuffaro would re-

ceive $250,000 for his assistance in obtaining the shipment. *Id.* at 65.

The plan was to bring the cocaine from Colombia aboard a ship named "Big John," with the cocaine concealed in the engine room. *Id.* The cocaine would then be transferred to a fishing boat in the south Mediterranean, near Sicily. *Id.* The Colombian supplier of the cocaine was going to be Walding Aponte Romero (aka Waldo) and his partner Angel Sanchez. *Id.* In October 1987, Galatolo and Cuffaro, on behalf of the Italian Mafia, met Waldo and Angel, who were the Colombian representatives. *Id.* at 53. The meeting took place on the island of Aruba in the Netherlands Antilles. *Id.*

Angel stated that he was anxious to do business with Cuffaro and Galatolo because they were Europeans and the best prospects for future cocaine sales would be in Europe as opposed to the United States where it was getting too dangerous. *Id.* Waldo and Angel stated that they would personally oversee the preparation of the cocaine to ensure its purity. *Id.* Galatolo emphasized to Angel that if the Colombians were going to ship cocaine to Italy they had better do it through the Sicilian Mafia. *Id.* Galatolo added that there would be a war if the Colombians did otherwise. *Id.* Galatolo and Angel then negotiated the price of cocaine and finally agreed on a price of $20,000–$21,000 per kilo. *Id.*

The shipment of cocaine was successfully brought to Italy and the next time Cuffaro saw Angel was at the Excelsior Hotel in early January 1988 in Rome, Italy. *Id.* The captain of "Big John," Allen Knox, was paid $1 million for his role. *Id.* at 65. Cuffaro received only $18,000 of the $250,000 that he was promised. *Id.*

The shipment had been received from the Colombians by consignment and the Italians still needed to pay them. Waldo had given Galatolo a phone number in Milan and a password to contact "Giuseppe" who would launder the proceeds for the Colombians. *Id.* at 67. Giuseppe would take cash from the Italians, carry that money to Switzerland for deposit in a Swiss bank,

and then transfer it to Los Angeles to an account of a friend of his, whose surname is Italian, and who works in the clothing business. *Id.* Galatolo's cousin, Vincenzo Galatolo, gave Giuseppe $1 million in February 1988. *Id.* That money was supposed to be sent to Waldo in Aruba, but there was a mistake, either in Switzerland, where Giuseppe took the money, or with his friend in Los Angeles. *Id.*

The Colombians were unhappy that they had not been fully paid and Angel repeatedly asked Cuffaro for the balance. *Id.* at 54. On one occasion, at Waldo's house in Miami, Cuffaro spoke to a "Doctor" Garzon in Medellin who also pressured him to come up with the balance. *Id.* On another occasion, Waldo called Angel and Angel, after speaking briefly with Cuffaro, put Dr. Garzon on the phone. *Id.* On a third occasion, Cuffaro called Dr. Garzon in Colombia from Italy when Cuffaro was there to pick up money for the Palermo deal. *Id.*

Some time in March 1988, Cuffaro, Galatolo and Waldo met two Colombians at Waldo's house in Miami. *Id.* The two Colombians said that they were there on behalf of Garzon to mediate the Palermo deal, but Galatolo became very hostile toward the one Colombian who did most of the talking. *Id.* Galatolo eventually agreed to meet this Colombian in Milan.

About a month and a half later Cuffaro and Galatolo did meet this individual in Milan. *Id.* at 67. Enzo Galatolo brought about 700 million lire to deliver to Giuseppe for further forwarding to the Colombians but the Colombian who came to Milan wanted to take possession of the money. *Id.* The emissary then called Medellin from a public phone and spoke with Dr. Garzon, whom he connected to Cuffaro because Cuffaro speaks Spanish. *Id.* at 68. Dr. Garzon wanted Cuffaro to give all the money to the emissary but Cuffaro replied that he did not know who Dr. Garzon was and the deal was with Waldo. *Id.* Dr. Garzon claimed, nevertheless, that he had been the owner of the cocaine. *Id.* Ultimately, Cuffaro and Galatolo agreed to deliver about 300 million lire (about $300,000)

to the emissary, who claimed he was taking it to Switzerland, and delivered the rest to Giuseppe directly. *Id.*

Altogether, Enzo Galatolo sent $7 million or more to Giuseppe. *Id.* The money was concealed in a car which usually carries agricultural products from Palermo to Milan. *Id.* From Milan, the car was driven to Switzerland where Giuseppe received it.

At some point, Cuffaro identified Giuseppe from a photograph as being Giuseppe Lottusi. *Id.* at 25.

### (2) *Boris Sanchez*

Angel Sanchez, the contact person for the Colombians, had a cousin by the name of Boris Sanchez. On December 7, 1990, Boris was questioned by Assistant United States Attorney Diana Fernandez, who had been appointed by the court as a Commissioner for the taking of evidence pursuant to a request from Italy, as well as by two magistrates from Italy. *Id.* at 101–35. Boris had been convicted of conspiring to distribute more than five kilograms of cocaine and he had decided to cooperate with the United States Government. *Id.* at 107–08.

Boris testified that he was a second cousin to Angel Sanchez. *Id.* at 108. He also stated that near or around November 1987 he heard about a shipment of cocaine from Colombia to Sicily. *Id.* at 109. Boris heard about it from Angel Sanchez's wife. *Id.* Angel's wife told Boris to help her collect the money that was due from the shipment. *Id.* The idea that Boris should become involved came from Angel. *Id.* at 110.

Boris further testified that the money belonged to Angel and Dr. Garzon. *Id.* Four hundred kilograms of cocaine had belonged to Angel and 100 kilograms had belonged to Dr. Garzon. *Id.* at 110, 113. Boris was supposed to collect the money from Waldo. *Id.* at 110. Boris agreed to do so. *Id.*

Boris was supposed to try and collect $14 million. *Id.* at 111. The $14 million was the balance of an original $15 million debt, the $1 million difference being the first payment that had already been made. *Id.*

Boris went to Waldo's house in Miami to collect the money. *Id.* at 114. Boris asked

why the payment for the cocaine was so slow and Waldo replied that selling 500 kilos of cocaine in Italy would go slowly. *Id.* at 114–15. They then called Angel to discuss the matter, *id.* at 116–18, and Waldo assured Angel that he would be paid. *Id.* at 118. Angel then told Boris that he would have to go to Italy to find out what was really going on. *Id.* The Italians and the Colombians then started to argue about the payment. *Id.* at 119. The arguing stopped and the Italian from New York, first name "Giovanni," said that his partner from New York would come down within three days to straighten the matter out and make arrangements for Boris to go to Italy. *Id.*

Three days later, Giovanni's partner did in fact come down to Miami. *Id.* at 120–21. It was decided that Boris' associate Wilmer Salazar would go to Italy as Angel's representative. *Id.* at 122. Giovanni's partner gave Wilmer Salazar the name and telephone number of a contact in Italy who would make the final arrangements for payment with him. *Id.* at 123.

Wilmer in fact went to Italy and then he called Boris. *Id.* at 126. (Hotel records confirm that Wilmer Salazar was in Italy on April 20, 1988; *Id.* at 152). Wilmer told Boris to tell Angel and Dr. Garzon not to worry because he had already seen something (meaning money) and that everything was okay. *Id.* at 126. Shortly thereafter, Boris was arrested for an unrelated shipment of 50 kilos of cocaine so that he does not know the results of Wilmer's trip to Italy. *Id.* at 126–27.

Boris was then shown two photographs. *Id.* at 129. He identified the first individual (who was holding a fish) as the man he knew as Giovanni. *Id.* He identified the second individual as Giovanni's partner who came down from New York. *Id.* at 130.

In actuality, the person Boris knew as Giovanni was really John Galatolo and the second individual was Joseph Cuffaro. *Id.* at 130. Boris also identified Angel and his wife from their photographs. *Id.* at 131. Boris also identified Waldo by his photograph. *Id.* at 132–33.

### (3) *Giuseppe Lottusi*

On March 4, 1992, after having been arrested for his role in importing the 600 kilograms of cocaine, and for laundering the proceeds thereof, Giuseppe Lottusi wrote a note to the Italian prosecutor stating that he was willing to cooperate. Exhibit C at 379–80.

In his note, Lottusi stated that at some point at the end of 1987, Moglia asked him if it was possible to make money transfers from Italy to Switzerland on an account opened with the Trade Development Bank in Geneva. *Id.* at 379: In response to that request, Lottusi contacted Lorenzo Aloisio, owner of FIMO SA, a Swiss bank, and he replied that for money transfers of up to about 300 million lire, the transfer would have to be made by bank transfer, while for higher amounts if would have to made by mail. *Id.* at 379. Moglia accepted this proposal, and from 1988 to 1990 he sent sums of money to Lottusi to be transferred to the Swiss bank. *Id.*

On March 5, 1992, Lottusi was interviewed by the Italian authorities. During this interview, Lottusi adopted the statements he had made in the letter and he also corroborated the statement given by Enzo Coltamai discussed below. Exhibit C at 388. In addition, Lottusi stated that in 1988 Moglia called him on the phone and asked if he (Lottusi) would be able to transfer sums of money that some people would hand to him (Lottusi) in Switzerland. *Id.* Lottusi agreed and he and Moglia set up procedures whereby Moglia would call Lottusi to tell him that a courier was arriving with a package of money and then Lottusi would deposit the money with the FIMO. *Id.* at 388–89.

Moglia then contacted Lottusi again and indicated that he had opened an account under the name of ODCI with the Trade Development Bank in Geneva and that he (Moglia) had spoken with Victor Dana, the manager of the bank. *Id.* at 389. The arrangement that Moglia had with Dana was that money transferred to FIMO would then be transferred to the TDB in Geneva and deposited in ODCI's account. *Id.* Moglia added that all deposits to

ODCI's account should have a reference name and that he (Moglia) would tell Lottusi the reference name before the transfer to the TDB was made. *Id.*

Shortly thereafter, the procedures agreed upon were followed successfully. *Id.* The first deposit was made on January 13, 1988, and because it was for only 100 million lire ($100,000), the transfer was done electronically. *Id.* But in June the amounts increased significantly so the money was transferred by parcel post in accordance with FIMO's requirements. *Id.* And with respect to these 11 mail transfers, Moglia always told Lottusi to take the cash and transfer it to ODCI's account with the TDB and to reference it to Garzon. *Id.* These money transfers occurred during 1988, 1989, and 1990. *Id.*

Lottusi was shown the FIMO printouts and confirmed that all transfers referred to therein were made to ODCI's account and as a result of requests from Moglia. *Id.* at 390. Although Lottusi was unable to identify Joseph Cuffaro and the Galatalos from photographs he was shown, Lottusi was able to identify Moglia from his photograph and stated that his wife, Clarissa Meditash, and his friend Rose Kirby, were with him when they met. *Id.*

### (4) *Enzo Coltamai*

On December 17, 1991, Enzo Coltamai was interviewed by the Italian authorities. Coltamai stated that he has been working at FIMO SA for 16 years and, at the time of the interview, was a deputy manager there. *Exhibit C at 174.* Giuseppe Lottusi began doing business with FIMO some 10 to 12 years ago. *Id.* at 174–75. Lottusi was a business consultant from Milan. *Id.* at 175. Lottusi's business was to assist his clients, he was not a client of FIMO's. *Id.*

Lottusi told Coltamai that he had at his disposal a certain amount of money to transfer from Italy to Switzerland and from Switzerland to Italy. *Id.* at 175. They made arrangements for such money transfers. *Id.* Of particular note, during the period of June 1988 until November 1989, Lottusi sent to FIMO in Chiasso, Switzerland a total of 10 billion lire in cash (in 50 and 100 thousand lire banknotes

which were wrapped in bundles of 5 and 10 million lire) (at the time 1000 lire equalled a dollar, so 10 billion lire roughly equated to 10 million dollars), which was then sent by mail to the Trade Development Bank in Geneva, Switzerland. *Id.* at 176.

FIMO obtained insurance on the postal packages containing the large amounts of cash and received receipts from the TDB in the name of Oficina De Cambio International with the most frequent reference to a Mr. Garzon. *Id.* at 178. (These bank records are discussed below).

Coltamai also stated that Lottusi once introduced a person who was with him. *Id.* at 179. The person's name was Moglia. *Id.*

### (5) *Records from FIMO and the Trade Development Bank*

By letter dated October 6, 1987 from Venezuela, Moglia opened an account at The Trade Development Bank of Geneva, Switzerland, on behalf of ODCI. *Exhibit C at 353.* A TDB record dated October 28, 1987 listed Moglia and Rose Kirby as representatives of ODCI with access to the bank account. *Id.* at 366–67.

A listing of the receipts indicates that FIMO deposited by mail more than 10 billion lire (approximately U.S. $10 million) in ODCI's account from June 16, 1988 until February 13, 1990. *Id.* at 238. *All* of the shipments sent by mail reference "Mr. Garzon." More specifically, the following transfers were made:

1) June 16, 1988: transfer of 1.4 billion lire to TDB (reference to Mr. Garzon) (Exhibit C at 287)

2) Sept 16, 1988: transfer of 1.8 billion lire to TDB (reference to Mr. Garzon) (*Id.* at 281)

3) Sept 30, 1988: transfer of 938 million lire to TDB (reference to Garzon) (*Id.* at 276)

4) Oct, 21, 1988: transfer of 938 million lire to TDB (reference to Mr. Garzon) (*Id.* at 272)

5) Nov. 28, 1988: transfer to 939 million lire to TDB (reference Mr. Garzon) (*Id.* at 270)

6) Dec. 20, 1988: transfer of 939 million lire to TDB (reference Mr. Garzon) (*Id.* at 261)

7) Jan. 24, 1989: transfer of 938 million lire to TDB (reference Mr. Garzon) (*Id.* at 255)

8) Feb. 27, 1989: transfer of 936 million lire to TDB (reference Mr. Garzon) (*Id.* at 254)

9) Apr. 17, 1989: transfer of 936 million lire to TDB (reference to Mr. Garzon) (*Id.* at 243)

10) Nov. 9, 1989: transfer of 376 million lire to TDB (reference to Mr. Garzon) (*Id.* at 241)

11) Feb. 13, 1990: transfer of 45 million lire to TDB (reference Mr. Garzon) (*Id.* at 238)

## B. The Withdrawals

Bank records obtained very recently from Switzerland indicate some of the following withdrawal information from ODCI's account at the Trade Development Bank in Geneva:

1) April 8, 1988: transfer of $55,149 to Chelsea National Bank in NYC

2) April 20, 1988: transfer of $339,000 to an unknown recipient (Note: hotel records indicate that Moglia and his brother Adriano were in Geneva on April 18, 1988, Exh. C at 371)

3) May 30, 1988: transfer of $90,200 to Irving Trust in NYC

4) June 10, 1988: transfer of $25,000 to Irving Trust

5) June 15, 1988: transfer of $86,000 to Irving Trust

6) June 16, 1988: transfer of $150,000 to Irving Trust

7) June 20, 1988: transfer of $200,000 to Bank of America in NYC

8) June 20, 1988: transfer of $350,000 to Irving Trust

9) Sept. 23, 1988: transfer of $400,000 to Irving Trust

10) Oct. 5, 1988: transfer of $300,000 to Bankers Trust

11) Oct. 5, 1988: transfer of $370,000 to Irving Trust

12) Oct. 25, 1988: transfer of $302,000 to Bankers Trust

13) Nov. 29, 1988: transfer of $300,000 to Bankers Trust

14) Dec. 12, 1988: transfer of $717,000 to Chase Manhattan Bank in NYC

The withdrawal documents indicated that most, if not all, of the money was transferred by Moglia and his friend Rose Kirby. Exhibits H, I, J, K1 and K2 are some of the letters written and signed by Moglia, which were then faxed to Victor Dana, the manager at the TDB with whom Moglia had made the arrangements (and whose name appears on the receipts from FIMO to the TDB), with instructions that some of the money transfers listed above be made. [Tr. 30–32]. For example, in a fax on RCG Enterprises stationery dated January 15, 1988, two days after Lottusi received the initial $100,000 payment, Moglia requested that Victor Dana, the manager of the TDB with whom Moglia had made the arrangements, transfer $75,000 to Banco Union in New York City to be further credit to Bano Union's office in Caracas, Venezuela. (Exhibit H).

Similarly, in a fax on RCG stationery, and dated January 28, 1988, Moglia instructed Victor Dana at TDB to transfer $127,000 U.S. to an account at the Bank of America. (See Exhibit I). Then, on February 18, 1988, Moglia, on RCG Enterprises stationery, faxed a request to Victor Dana to transfer $45,000 from the ODCI account in the TRB to Banco Union in NYC. (See Exhibit J). Other transfer requests were made by Moglia's friend Rose Kirby. These records are only a small sample of the telefax and telephone requests for transfers requested by Moglia and Rose Kirby. Testimony of Italian Inspector Massimo Mazzarella.

Some of the transfers were directed to accounts controlled by one Rafael Alcantara, a resident of Venezuela. (See Tr. 32; Exhibit K1). One document indicates that $347,000 was transferred from ODCI's account to Bankers Trust in New York to be credited to the account of Alcantara. (Exhibit K1). The request for the transfer was made by Moglia by telephone. Testi-

mony of Italian Inspector Mazzarella. (Moglia's initials appear on the left side of the document.) Another document is a telefax request from Moglia to the TDB requesting two transfers of money from ODCI's account—each for $250,000 and each to an account used by Alcantara. (Exhibit K2).

FBI Special Agent Kevin Peterson testified at the hearing that Alcantara is known to be a major figure in laundering the proceeds of cocaine distributions. [Tr. 14–15]. Alcantara has been a recipient of laundered narcotics proceeds involving Columbian drug traffickers in three cases that Agent Peterson has either worked on or is familiar with. *Id.*

### (6) *The Ship Records*

The Harbor Master's office in Palermo provided ship records. Exhibit C at 137. They indicate that a ship named "Big John" arrived in Palermo from Malta on January 21, 1988. *Id.*

### (7) *The Hotel Records*

The hotel records show that Cuffaro (exhibit C at 142) and Waldo Aponte Romero (*id.* at 145) were in Rome at the time Big John was docked in Palermo.

### (8) *The FBI's Cooperating Witness*

This witness stated that he has known Moglia since 1986 (Tr. 11, Exhibit G). Moglia used his jewelry store as a front for a large scale drug money laundering operation. The witness also stated that on one occasion in 1989 he was at RCG when two Colombians entered the business carrying a briefcase full of cash. *Id.* The witness did not know how much money was there but recalled that Moglia used a money counter for counting the money. *Id.* Moglia's wife, Clarissa, was also there and she was also heavily involved in the money laundering operation. *Id.*

The witness added that Moglia and his wife were heavily involved in laundering money for Colombian drug traffickers including Gustavo Valdez. *Id.* As a result of their financial success in the money laundering business, Moglia and his wife purchased a large boat which they docked at a marina in Marina Del Ray as well as a

number of luxury automobiles. *Id.* The witness identified other individuals who were also involved in the money laundering operations of the Moglias. *Id.* The witness also was involved personally in at least one transaction of cocaine from himself to Moglia. [Tr. 12]. That transaction involved the sale of 750 grams (three-fourths of kilogram) of cocaine to Moglia for $23,000. *Id.*

### (9) *The Wire-tapping of Lottusi's Telephone*

Italian Inspector Massimo Mazzarella testified at the hearing that a wire-tap on Lottusi's telephone corroborated that he was in contact with Giancarlo Formich Moglia, while the latter lived in Australia. [Tr. 33–35]. In particular, on April 17, 1991 Moglia called Lottusi in Italy. *Id.* at 34. Moglia referred to their past business dealings and stated that he wanted to start them up again. *Id.* Moglia asked to send a representative to see Lottusi but Lottusi did not want to meet with anyone he did not know and suggested that Moglia come personally to see him. *Id.* at 35.

### (10) *CUSTOMS INVESTIGATION*

On October 9, 1991, a memorandum prepared by the U.S. Customs Service attempted to further document the connection among Moglia, R.C.G. Enterprises, Oficina De Cambio International and their efforts to transfer large sums of money. The memorandum appears on pages 409–414 of Exhibit C. This investigation indicated that more than $42 million dollars in cash, and in bills with small denominations of less than $100, were being deposited with Moglia's companies, RCG, ODCI and ODC. *Id.*

### A. Analyzing The Facts

The facts in this complicated case can best be analyzed by organizing the events chronically and then by examining how the different parts fit together. The deal for the 600 kilograms of cocaine was negotiated in Aruba in October 1987. Concurrently, Moglia, on October 6, 1987, opened an account with the Trade Development Bank in Geneva, Switzerland on behalf of ODCI. On October 28, 1987 Moglia was identified as the Swiss representative for ODCI.

Also around the same time period, Moglia contacted Giuseppe Lottusi and asked Lottusi if he could transfer large amounts of cash from Milan, Italy to Geneva. Lottusi agreed.

By the time the ship "Big John" docked in Palermo on January 21, 1988, the cocaine already had been offloaded onto smaller boats in the south Mediterranean. Exhibit C at 65. The Colombians were ready to be paid and Romero gave John Galatolo the name of "Giuseppe" in Milan, with a telephone number and password, as the person to be paid. *Id.* at 67. Cuffaro went with John and his cousin, Enzo Galatolo, to Giuseppe's office in Milan. *Id.* There, and a second time later in March or April 1988, Cuffaro met Giuseppe. *Id.* at 67–68. When interviewed by the police, Cuffaro identified Giuseppe as being Giuseppe Lottusi. *Id.* at 25.

Giuseppe Lottusi has acknowledged sending large sums of cash from Milan to the Geneva, Switzerland and that he did so after Moglia asked him to do so. The evidence indicates that Lottusi received payment for the 600 kilograms of cocaine and that he transferred that money—more than $10 million—to the account of ODCI in the Trade Development Bank. It also appears that Moglia and his friend Rose Kirby then continued to launder the money from the cocaine distribution by transferring it from the TDB to the bank accounts in New York and from there to Venezuela, including some of the funds going to a known money launderer named Rafael Alcantara. *See* Exhibits H, I, J, K1, K2. Many of the transfers were requested on RCG Enterprises stationery, with Moglia's signature appearing on the documents. *See id.*

Further evidence of the fact that the money being transferred by Moglia was the proceeds from the drug conspiracy was the reference to Mr. Garzon that appears on all [5] of the mail receipts for the transfer of more than $10 million from Milan to Geneva (via FIMO in Chiasso, Switzerland). Mr. (or "Dr.") [6] Garzon was at least part owner of the 600 kilograms of cocaine and the fact Moglia told Lottusi to put down Garzon's name on the transfers as a reference is a further indication of the connection.

Finally, but perhaps less significantly, the Court finds that it is relevant and material to note the other evidence the government has presented with respect to Moglia's activities during the time period in question, even though those activities have not as yet been specifically connected to the 600 kilogram shipment. It is clear that while in Los Angeles, Moglia was laundering the proceeds of narcotics trafficking. An FBI informant provided a first-hand account of the laundering activities that Moglia engaged in at RCG Enterprises. The employees of Brink's used to transfer hundreds of thousands of dollars in cash out of RCG Enterprises while observing that there seemed to be no legitimate source for the money. Indeed, the manager of RCG Enterprises, Michael Meditash (Moglia's stepson) acknowledged that it would appear to an outsider that the money was derived from narcotics trafficking.

The Brinks' employees provided further evidence that ODCI and RCG Enterprises were, in actuality, the same company. Not only did they have the common denominators of Moglia and Rose Kirby, but they worked out of the same offices in Los Angeles. Brinks would pick up money in accordance with an ODCI contract at RCG's offices.

Also, the investigation conducted by the Customs Service indicated that large amounts of cash in bills with small denominations were being deposited with Moglia's companies. FBI Special Agent Kevin Pe-

---

**5.** Except for the third transfer which referred to "Garzon" without the "Mr."

**6.** Moglia has argued that there should be some significance attached to the fact that the person who spoke to Cuffaro was called "Dr." Garzon while the mail receipts refer to "Mr." Garzon. The court finds no significance to the difference. In many parts of the world, including Italy and South America, the title "Dr." is one of respect and does not necessarily indicate that the person is a medical doctor. Similarly, here in the United States psychologists, dentists, persons with Ph.D's, and even some lawyers use the term "Dr." even though they are not licensed to practice medicine.

terson, a law enforcement officer with special training and experience in money laundering activities, testified that the circumstances here—the use of a front company with no apparent legitimate source of income, the presence of large amounts of cash, which had been brought in by Colombians—were indicative of a money laundering operation of narcotics proceeds.

In sum, in viewing the "totality of circumstances," *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983), there is probable cause to believe that there was a conspiracy to distribute cocaine from Colombia to Sicily and Moglia had much more than a slight connection to the conspiracy. *See United States v. Cuevas*, 847 F.2d 1417, 1422–23 (9th Cir.1988) (In order to convict someone of participating in a drug conspiracy, "[o]nce the government has proved that a narcotics conspiracy exists, 'evidence of only a *slight connection* is necessary to convict a defendant of knowing participation in it.'") (citations omitted) (court found sufficient evidence that defendant knew that the money he deposited and withdrew were derived from a narcotics conspiracy).

Indeed, in view of the fact that independent statements making similar allegations from multiple persons lend credence to each in evaluating probable cause, *see United States v. Hernandez–Escarsega*, 886 F.2d 1560, 1566 (9th Cir.1989) ("Although the reliability of several of Johnson's confidential sources was not clearly established, the detailed nature of many of their statements and the interlocking nature of their stories enhanced their credibility."), it is clear from all of these sources and corroborating documents that Moglia played an indispensable role in the conspiracy in arranging for Lottusi to receive the payment for the deal and then by transferring the money out of Geneva once Lottusi had deposited it there.[7] Therefore, as to the second count, the Government of Italy has met its burden.

As to the first count—whether there is probable cause to believe that Moglia committed the substantive act of distribution or importation—American case law is clear that the term "distribution" is to be construed broadly. *See United States v. DeRosa*, 670 F.2d 889, 893 (9th Cir.1982) (defendant who arranged for payment for drugs convicted of distributing the drugs). Moreover, as a conconspirator, Moglia is liable for the substantive offenses committed by the other members of the conspiracy. *See United States v. Pinkerton*, 328 U.S. 640, 645–47, 66 S.Ct. 1180, 1183–84, 90 L.Ed. 1489 (1947); *United States v. Mares*, 940 F.2d 455, 460 (9th Cir.1991).

### 6. *Moglia Has Been Properly Identified As The Person Charged In Italy*

Moglia concedes that he is the person that has been charged in Italy. Therefore, the Government of Italy has satisfied this requirement as well.

## IV. CONCLUSION

The Government of Italy has fulfilled all six requirements of the extradition Treaty

---

**7.** That is especially true when one compares the facts of this case with other extradition cases such as *Bozilov v. Seifert*, 967 F.2d 353 (9th Cir.1992). There, the court found sufficient facts establishing probable cause when two couriers "implicated Bozilov in a worldwide smuggling conspiracy." *Id.* at 355. Germany also established that Bozilov received a large deutsche mark transfer from one of the coconspirators in Germany, as well as several phone calls. The Ninth Circuit concluded that "Bozilov's connections to Germany are sufficient to establish his participation in a drug conspiracy." *Id.*

Similarly, here, Moglia was directly implicated by one of the couriers, Lottusi, in the laundering of narcotics money. Lottusi and Moglia were connected to the 600 kilogram shipment through Cuffaro. The statements given by Lottusi and Cuffaro are corroborated by the temporal proximity of events: Moglia requested Lottusi to launder the funds around the same time that the deal was struck in Aruba and around the same time that Moglia opened the account for ODCI with the TDB. The fact that Moglia withdrew large sums of cash from the ODCI account and sent them to a known money launderer is further evidence. Finally, the fact that the FBI and Customs investigations made it clear that Moglia was involved with significant money laundering activities during the relevant time period, and on behalf of Colombians, makes the proof in this case seem far more compelling than that in *Bozilov*, which, nonetheless, the Ninth Circuit found to be adequate.

with the United States and has satisfied American law as well. Therefore, this court certifies the extraditability of Moglia to the Secretary of State of the United States of America on the charged offenses.

IT IS SO ORDERED.