**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CRISTOBAL RODRIGUEZ BENITEZ,
*Petitioner-Appellant,*

v.

SYLVIA GARCIA, Warden,
*Respondent-Appellee.*

No. 04-56231

D.C. No.
CV-02-00489-DMS

OPINION

Appeal from the United States District Court
for the Southern District of California
Dana M. Sabraw, District Judge, Presiding

Argued and Submitted
July 13, 2005—Pasadena, California

Filed May 23, 2006

Before: Jerome Farris, Dorothy W. Nelson, and
Richard C. Tallman, Circuit Judges.

Opinion by Judge D.W. Nelson

## COUNSEL

Barbara Strickland, San Diego, California, for the appellant.

Matthew Mulford, Deputy Attorney General, San Diego, California, for the appellee.

## OPINION

D.W. NELSON, Senior Circuit Judge:

Cristobal Rodriguez Benitez was arrested in Venezuela and extradited to the United States. Benitez was tried and convicted of murder, and sentenced to an indeterminate sentence of fifteen years to life (in addition to four years for the use of a firearm).[1] Benitez petitioned for a writ of habeas corpus,

---

[1] The sentencing hearing transcript and the abstract of judgment indicate that Benitez received a five-year additional enhancement for using a gun.

arguing that his sentence could not exceed thirty years because of an extradition decree from the Supreme Court of Venezuela and the Venezuelan Ministry of Foreign Affairs pursuant to the extradition treaty between the United States and Venezuela. The district court denied his petition, and Benitez appealed.

The rights claimed by Benitez pursuant to the extradition treaty are clearly established federal law pursuant to treaty law, and the sentence issued by the California Superior Court contravenes these rights, providing a basis for reversal. Where the provisions of the extradition treaty so provide, the surrendering country may expressly condition extradition of the fugitive. Federal habeas courts may enforce limitations on punishment if a potential punishment exceeds the conditional punishment imposed by the country agreeing to extradite the defendant in a particular case.

Applying that condition to this case, we decide that Benitez may not be sentenced to more than thirty years in prison. We therefore reverse the decision of the district court and grant the requested petition for a writ of habeas corpus.

# I

Benitez, a Mexican citizen, was convicted of murdering a man involved in an altercation with Benitez's brother in San Diego, California. Right after the shooting, Benitez returned to his apartment, scrambled together a few items, and fled the country, eventually arriving in Caracas, Venezuela. On June 25, 1997, the United States requested that Venezuela extradite Benitez to face California charges pursuant to the extradition

Both parties agreed that the court actually imposed an enhancement of four years, and therefore the state appellate court decided that it would be correct to change Benitez's sentence to reflect the correct four-year (rather than five-year) enhancement.

treaty entered into between the United States and Venezuela in 1922. That extradition treaty provides that:

> [T]he Contracting Parties reserve the right to decline to grant extradition for crimes punishable by death and life imprisonment. Nevertheless, the Executive Authority of each of the Contracting Parties shall have the power to grant extradition for such crimes upon the receipt of satisfactory assurances that in case of conviction the death penalty or imprisonment for life will not be inflicted.

Treaty of Extradition, Jan. 19-21, 1922, U.S.-Venez., Art. IV, 43 Stat. 1698, T.S. No. 675.

On June 25, 1997, the Venezuelan Ministry of Foreign Affairs—upon receiving the request to extradite Benitez from the United States—contacted the United States Embassy and asked for information related to the sentence Benitez might face if he were eventually convicted in an American court. The United States Embassy responded on November 6, 1997, and indicated that under California law "if convicted of murder, and if murder in the first degree is found, Cristobal Rodriguez Benitez would receive a sentence of incarceration of 25 years to life." The Ministry of Foreign Affairs in Venezuela received this correspondence from the United States, and indicated that it understood the response to mean that "in principle" Benitez would not be subject to a sentence of greater than thirty years.

On August 17, 1998, the Supreme Court of Venezuela approved the extradition of Benitez, but stated that if an American court convicts Benitez it "shall not . . . impose[ ] a penalty involving [the] death penalty or life imprisonment or punishment depriving his freedom for more than thirty years." The Ministry of Foreign Affairs in Venezuela received this decision, and communicated to the United States that the extradition of Benitez was "*conditioned* to the understanding

that [Benitez] will not be sentenced to . . . life in prison or incarceration for more than thirty (30) years." (emphasis added). Benitez was extradited from Venezuela to the United States on August 28, 1998.

On November 5, 1998, the San Diego County District Attorney filed an information alleging that Benitez committed murder and personally used a firearm, in violation of California Penal Code § 12022.5(a). On July 16, 1999, about the time that Benitez's trial was to commence, the Venezuelan Embassy wrote to the United States Department of Justice stating its concern that the sentence Benitez faced "may violate the provisions of the Extradition Treaty" between the United States and Venezuela, and also might violate "the conditions established in the sentence of the Supreme Court of Venezuela which approved the extradition request presented by the Government of the United States."

Benitez raised this issue at trial in California state court, but without success. Benitez was eventually convicted of murder by the California court. The day before he was to be sentenced (on August 30, 1999) the United States Department of State faxed a letter to the District Attorney of San Diego County, indicating that even though the State Department did "not believe the Office of the District Attorney is required to make such a recommendation," the Department of State still believed it would be wise if Benitez were not issued a life sentence. Benitez was given an indeterminate sentence of 15 years to life, with an enhancement for the personal use of a firearm. At the sentencing hearing, the state trial court decided that the sentence was appropriate, and indicated that Benitez's argument that the sentence violated the terms of his extradition was not "ripe for . . . review."

Benitez's state habeas petitions were denied by the state courts. The federal magistrate judge determined that Benitez's petition challenging his sentence had merit, but was not ripe because Benitez might not actually be forced to serve jail time

exceeding thirty years. The district court found that the dispute over the sentence was ripe, but decided that Benitez had failed to demonstrate that his sentence violated clearly established federal law.

## II

We have jurisdiction over this case pursuant to 28 U.S.C. §§ 1291 and 2253(c). This court reviews the district court denial of a writ of habeas corpus *de novo*. *Leavitt v. Arave*, 371 F.3d 663, 668 (9th Cir. 2004). Because Benitez filed his petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), AEDPA provides the governing standard of review in this case. *See Woodford v. Garceau*, 538 U.S. 202, 207 (2003). Therefore, applying AEDPA, we may only grant the petition for habeas corpus if the state court decision was "(1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

## III

**[1]** Before we turn to the merits, we must first address the claim that Benitez's petition faces ripeness problems, because, as the magistrate judge argued, "his right to seek federal habeas relief will accrue, if at all, when he has served a full 30 year prison term and is not immediately released." The ripeness issue is easily resolved because the extradition of Benitez was conditioned upon a limitation on what sentence could be *entered* against Benitez, as well as what sentence he could *actually serve*. The extradition decree entered by the Venezuelan Supreme Court stated that "no sanction shall be *imposed*." (emphasis added). Likewise, when the Venezuelan Ministry of Foreign Affairs informed the Embassy of the

United States of the actions of the Venezuelan Supreme Court, it indicated that Benitez's extradition was "conditioned to the understanding that the aforementioned citizen will not be *sentenced* to death or life in prison or incarceration for more than thirty (30) years." (emphasis added).

**[2]** Benitez was actually sentenced by the California Superior Court to a sentence of fifteen years *to life*. Without regard to whether Benitez *might* be paroled before he serves thirty years of his sentence and what his *actual sentence or time incarcerated* could be, this dispute became ripe as soon as the California state court entered its sentence, because the conditions of Benitez's extradition limited what sentence could be issued as well as what sentence could be served. *Cf. United States v. Campbell*, 300 F.3d 202, 211 (2d Cir. 2002) (recognizing a difference between extradition terms limiting what sentence could be entered by the receiving state's courts and what sentence the receiving state could force the prisoner actually to service). We therefore need not decide whether, absent this limitation regarding what sentence could be entered, a limitation regarding what sentence could be *served* would be immediately ripe.

## IV

### A

We next turn to the merits of Benitez's challenge to his sentence. Since this case is governed by AEDPA, we must first look for the "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). In this case, the source of clearly established federal law we rely upon is the extradition treaty between the United States and Venezuela, and we decide that the state court's application of the extradition treaty was an "unreasonable application of[ ] clearly established federal law." *Williams v. Taylor*, 529 U.S. 362, 411 (2000).

**[3]** The extradition treaty, as a duly ratified treaty entered into by the United States, is federal law pursuant to the Supremacy Clause. *See* U.S. CONST., Art. VI.**²** Whether this treaty is *clearly established* federal law, though, presents an issue this court has not addressed since the enactment of AEDPA. Two Supreme Court cases discussing extradition treaties from long ago, *United States v. Rauscher*, 119 U.S. 407 (1886), and *Johnson v. Browne*, 205 U.S. 309 (1907), instruct us to apply the treaty and treaty-based actions, but they do not tell us what constitutes "clearly established" federal treaty law.

Courts may well be required to examine the language of the treaty itself in order to determine whether the law it states is clearly established. AEDPA also instructs us to apply "clearly established federal law . . . *as determined by the Supreme Court of the United States*," 28 U.S.C. § 2254(d) (emphasis added), but does not tell us what clearly established federal

---

**²**Because the limitations on punishment in this case derive from a treaty and therefore from federal law as defined by the Supremacy Clause of the Constitution, we find no merit in the concern articulated by the state trial court and the state appellate court that, as the state appellate court indicated, "the court has [no] power to fashion an alternative remedy, other than the sentence that is mandated by California law." The treaty *is* federal law, and therefore California sentencing regimes must yield to the extent there are any inconsistencies with the California sentencing rules. *See* U.S. CONST., Art. VI ("[A]ll Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the *Judges in every State shall be bound thereby*, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.") (emphasis added); *Howlett v. Rowe*, 496 U.S. 356, 369-70 (1990) ("[S]tate courts have the coordinate authority and consequent responsibility to enforce the supreme law of the land."); *Hauenstein v. Lynham*, 100 U.S. 483, 490 (1879) ("[T]he Constitution, laws, and treaties of the United States are as much a part of the law of every State as its own local laws and Constitution."). *Cf. Alden v. Maine*, 527 U.S. 706, 753 (1999) ("The Supremacy Clause does impose specific obligations on state judges."); *Printz v. United States*, 521 U.S. 898, 907 (1997) (stating that the Constitution "permit[s] imposition of an obligation on state judges to enforce federal prescriptions").

treaty law might be when the Supreme Court has not substantially addressed a particular treaty, as is the case here. In other words, the interaction between treaty rights and AEDPA habeas law presents a difficult and heretofore unexamined issue.

**[4]** In this case, though, that specific issue need not concern us. The unambiguous language of the treaty itself is indisputably clearly established federal law. A further examination of the facts in this case, as we discuss in Part IV, demonstrates that the interactions between the United States and Venezuela pursuant to the treaty indicate that the treaty right Benitez claims is also clearly established federal law pursuant to the treaty. In other words, no matter what clearly established federal law might be in the context of treaties, Benitez has proven that there is such clearly established federal law as the treaty applies to him in this case.

In this case, in addition to the Treaty itself, we agree with the state court that the only other sources of clearly established federal law we can locate are *Rauscher* and *Browne*. *Rauscher* and *Browne* both stand for the same principle: An extradited defendant can "only be tried for one of the offenses described in that [extradition] treaty." *Rauscher*, 119 U.S. at 430. *See also Browne*, 205 U.S. at 316 (stating that it is impermissible to try a defendant other than "for the crime for which he has been extradited"). Over time, this rule from *Rauscher* and *Browne* has come to be known as the doctrine of specialty. *See, e.g.*, *Quinn v. Robinson*, 783 F.2d 776, 783 (9th Cir. 1986) ("The doctrine of 'specialty' prohibits the requesting nation from prosecuting the extradited individual for any offense other than that for which the surrendering state agreed to extradite.").

The doctrine of specialty on its own terms, however, offers Benitez no relief, because it merely limits the crimes with which Benitez can be charged, not the punishments the state can impose. Because the Venezuelan treaty is sufficient to

afford Benitez relief, we need not reach whether extending the doctrine of specialty is required here.

**[5]** We hold that we can enforce limitations on punishments following the extradition of a defendant, but we may do so *only if the contracting treaty nations agreed* to such a limitation in the particular case. *See Rauscher*, 119 U.S. at 422 ("This proposition of the absence of express restriction in the treaty of the right to try him for other offenses than that for which he was extradited, *is met by the manifest scope and object of the treaty* itself") (emphasis added); *Browne*, 205 U.S. at 318 ("*The manifest scope and object of the treaty* itself . . . limit[s] the . . . crime for which extradition had been demanded and granted.") (emphasis added). We must therefore examine the extradition agreement in this case, and ask the question: Did the treaty and extradition activities of the parties in this case provide for a clear limitation on the punishment Benitez could face? If the answer is yes, we must enforce whatever punishment limitation we find.

## B

The State of California argues that the state superior court made a finding of fact that there was no agreement to limit the punishment Benitez could receive if convicted in the United States. We agree that the state court did make this finding of fact, but we are permitted to disregard these findings of fact if we determine that the presumption of correctness in their favor is "rebutt[ed] . . . by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Davis v. Woodford*, 333 F.3d 982, 991 (9th Cir. 2003). In this case, we find there exists sufficient rebuttal evidence to overturn the factual finding by the state court, and we therefore hold that Venezuela had conditioned the extradition by limiting the punishment Benitez could receive because it is what "the surrendering country wishe[d]." *United States v. Najohn*, 785 F.2d 1420, 1422 (9th Cir. 1986) (citation omitted).

We must look, first and foremost, to what the surrendering state expected and believed the extradited defendant would face. In *Browne,* the Supreme Court decided that "[w]hether the crime came within the provision of the treaty was a matter for the decision of the [surrendering] authorities." *Browne*, 205 U.S. at 316. Our foremost concern is to "ensur[e] that the obligations of the requested nation are satisfied." *United States v. Andonian*, 29 F.3d 1432, 1435 (9th Cir. 1994). *See, e.g.*, *United States v. Cuevas*, 847 F.2d 1417, 1428 (9th Cir. 1988) (stating that "the appropriate test is whether the extraditing country" would object); *Restatement (Third) of the Foreign Relations Law* § 477 Comment b ("The standard for adjudicati[on] . . . in the United States is whether the requested state has objected or would object to prosecution.").

**[6]** As part of this assessment of "what the surrendering country wishes," *Najohn*, 785 F.2d at 1422, courts look to the extradition decree issued by the surrendering country, as well as documents related to that decree. In *Rauscher*, the Supreme Court explicitly looked at the "processes by which [extradition] is to be carried into effect." *Rauscher*, 119 U.S. at 420. *Id.* at 421 (ensuring that the "proceedings under which the party is arrested in a country" are given due respect). *See, e.g.*, *Andonian*, 29 F.3d at 1436 (looking to the surrendering country's "extradition order"); *United States v. Cuevas*, 847 F.2d 1417, 1425 (9th Cir. 1988) (same); *United States v. Najohn*, 785 F.2d 1420, 1422 (9th Cir. 1986) (same). Indeed, we have decided that implementing the Supreme Court's decision in *Johnson* requires that "deference [is] to be accorded a surrendering country's decision on extraditability." *United States v. Van Cauwenberghe*, 827 F.2d 424, 429 (9th Cir. 1987). *See also United States v. Campbell*, 300 F.3d 202, 209 (2d Cir. 2002) ("Whether or not express terms in a treaty make the extraditing country's decision final as to whether an offense is extraditable, deference to that country's decision seems essential to the maintenance of cordial international relations."); *Casey v. Dep't of State*, 980 F.2d 1472, 1477 (D.C. Cir. 1992) ("[A]t a minimum, *Johnson* means that an Ameri-

can court must give great deference to the determination of the foreign court in an extradition proceeding."); *United States v. Jurado-Rodriguez*, 907 F.Supp. 568, 574 (E.D.N.Y. 1995) (deciding that the United States must "must abide by the terms and limitations [the surrendering country] has explicitly included in its extradition decree").

**[7]** In this case, although the initial correspondence from the United States indicated that Benitez could face life imprisonment, Venezuelan wishes were always clearly articulated. The Venezuelan Ministry of Justice acknowledged the receipt of the correspondence from the United States by stating its understanding that "in principle" Benitez would not face "life incarceration." The extradition decree issued by the Venezuelan Supreme Court repeated this very same understanding, but using even more explicit language: Benitez was not to receive "punishment depriving his freedom for more than thirty years." The extradition decree indicated not only that this was Venezuela's understanding of what punishment Benitez would face, but that his extradition was "*subject to the fact* that the referred citizen shall not be imposed a penalty involving [the] death penalty or life imprisonment or punishment depriving his freedom for more than thirty years." (emphasis added).

The Venezuelan Ministry of Foreign Affairs wrote to the Embassy of the United States to explain the extradition decree, stating that "[s]aid extradition *is conditioned* to the understanding that the aforementioned citizen will not be sentenced to death or life in prison or incarceration for more than thirty (30) years." (emphasis added). Because we must examine and defer to the surrendering country's wishes, particularly as they are expressed in its extradition decree, these statements are telling.

If this particularly probative evidence of Venezuela's pre-extradition behavior were not sufficient to prove that Venezuela understood this extradition to encompass a limitation on

the punishment Benitez could face, the sequence of events following Benitez's extradition confirm Venezuela's understanding of the punishments Benitez would not face. *See Zicherman v. Korean Air Lines Co.*, 516 U.S. 217, 226 (1996) ("[Courts] traditionally consider[ ] as aids to . . . interpretation . . . the postratification understanding of the contracting parties."). After Benitez was extradited but before his trial, the Venezuelan Embassy sent the Department of State a diplomatic note indicating that it was "concerned that [life imprisonment] may violate the provisions of the Extradition Treaty . . . as well as the conditions established in the sentence of the Supreme Court of Venezuela which approved the extradition request."

**[8]** It is also settled that "[r]espect is ordinarily due the reasonable views of the Executive Branch concerning the meaning of an international treaty." *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 168 (1999) (*citing Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 184-85 (1982)). Rather than disagreeing with Venezuela, the United States Department of State faxed a letter to the District Attorney that "it would be in the best interests of our extradition relationship for Mr. Rodriguez Benitez *not to serve* a life sentence." While this letter also indicated the request was not legally binding, it does cast doubt on the notion that there is a clear executive position in favor of permitting life imprisonment to which we must defer in deciding this case.

**V**

**[9]** Because we find that clearly established federal law applies to limit the punishments extradited defendants can receive when conditionally extradited under a Treaty, and the facts of this case indicate that such limitations were intended here, we reverse the decision of the district court. Since the Venezuelan extradition decree and the subsequent official notification of Venezuela's understanding of the extradition terms indicated that Benitez was not to be sentenced to more

than thirty years, we conclude that California may not sentence Benitez to more than thirty years of imprisonment. We therefore remand to the district court to enter habeas relief consistent with this decision.

**PETITION GRANTED AND REMANDED TO DISTRICT COURT.**