COURT OF APPEALS OF VIRGINIA

Present: Judges Friedman, Raphael and White
Argued at Richmond, Virginia

HEBER OTONIEL LUNA CONTRERAS

MEMORANDUM OPINION[*] BY
v.       Record No. 1753-24-2       JUDGE KIMBERLEY SLAYTON WHITE
MARCH 10, 2026

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF HANOVER COUNTY
James S. Yoffy, Judge Designate

Brendan D. O'Toole (Elwood Earl Sanders, Law Office of Elwood
Earl Sanders, on briefs), for appellant.

Virginia B. Theisen, Senior Assistant Attorney General (Jason S.
Miyares,[1] Attorney General, on brief), for appellee.


This case is about whether the criminal prosecution of a defendant for felony murder is

permitted under the U.S. extradition treaty with Guatemala and what consequences follow from

such a determination. Following a serious car wreck on August 8, 2020 resulting in several

injuries and one death, appellant Heber Otoniel Luna Contreras was charged with felony hit and

run (Code § 46.2-894), felony driving under the influence – third offense (Code § 18.2-266;

Code § 18.2-270), felony driving on a suspended license (Code § 46.2-391), and felony murder

(Code § 18.2-33). After the accident occurred and before he could be apprehended, Luna

Contreras fled to Mexico and then to Guatemala, escaping the reach of Virginia courts. To bring

him back for prosecution, the Commonwealth, in consultation with the U.S. Department of

Justice and the U.S. Department of State, extradited Luna Contreras pursuant to the "Treaty for

---

[*] This opinion is not designated for publication. See Code § 17.1-413(A).

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

the mutual extradition of fugitives from justice" between the U.S. and Guatemala ("Treaty").

*See* U.S.-Guat., Feb. 27, 1903, 37 Stat. 2147-56. Once back in the United States, the

Commonwealth brought Luna Contreras to trial, but in compliance with the Treaty, the charges

were limited to felony murder pursuant to Code § 18.2-33. Luna Contreras makes nine

assignments of error, which we consolidate into four main claims: (1) his conviction was in error

because felony murder is not an enumerated crime for which one can be extradited and

prosecuted under the Treaty; (2) his conviction was in error because, to prove all the elements of

the crime, the Commonwealth would have to prove violations of crimes that are not enumerated

in the Treaty—namely, traffic or other offenses that satisfy the element of malice; (3) the warrant

upon which Luna Contreras was extradited was based on a non-offense and his conviction

violated the doctrine of specialty; and (4) either or both the warrant and the indictment of Luna

Contreras cite a non-offense under Virginia law as the basis of the extradition and conviction.

Since none of the facts surrounding the events of August 8, 2020 are in dispute here, we

sketch those very briefly before describing the facts pertinent to the issues on appeal. We then

address the merits of Luna Contreras' assignments of error, providing additional facts from the

record pertinent to each.

## I. BACKGROUND

On the morning of the fatal crash, an eyewitness called authorities to report a black Jeep

Wrangler on Patrick Henry Road "driving erratically and expelling beer cans and bottles out of

its windows." Luna Contreras was the driver of the Wrangler. Minutes later, several calls came

in reporting that the Wrangler had veered into oncoming traffic and sideswiped a Jeep Cherokee.

The Wrangler moved back into its own lane but then veered into oncoming traffic again and hit a

Subaru Outback head-on. The airbags deployed in both vehicles, the vehicles ran off the road,

and the Outback caught on fire. One passenger was ejected from the Wrangler and died at the

hospital from blunt force trauma to the head. At least one other passenger was injured. Several witnesses reported that Luna Contreras fled the scene and, though he was spotted later that same day, he escaped to Mexico and then to Guatemala.

Luna Contreras was found in his native Guatemala and extradited on a warrant of arrest. The warrant cited Code § 18.2-33 as the basis for the extradition along with the very brief explanation of the charge: "accidentally kill and murder Jonathan Rioz Perez in the second degree while in the commission of a felony." At a preliminary hearing, the Commonwealth dropped all but one charge—Code § 18.2-33 felony murder—from the district court because of the Treaty restrictions. Luna Contreras was indicted February 21, 2023, on one count of felony murder.

Based on issues pertaining to the extradition treaty, Luna Contreras filed a motion to dismiss the charges on September 14, 2023. At a hearing that same day, he made multiple contentions relating to the assignments of error here, including (a) that the felony murder charge does not constitute voluntary homicide and that non-voluntary homicide is not extraditable according to the treaty; (b) that the predicate traffic felony is not an extraditable charge; (c) that the warrant failed to state an offense; and (d) that the conviction violates the specialty doctrine. At the same hearing, the Commonwealth argued that the propriety of the extradition is best left in the judgment of the extraditing country and that the conviction did not violate the specialty doctrine because all relevant documents cited Code § 18.2-33 as the basis for the extradition and conviction. The hearing was continued to December 1, 2023 in order to procure documents for the record. At that hearing, the trial court ruled in favor of the Commonwealth on the preliminary issues related to the treaty. At a December 7, 2023 hearing, Luna Contreras waived his right to a speedy trial. After several continuances, the trial was set for November 21-22, 2024.

On October 17, 2024, the trial court set a hearing to address a new motion to reconsider the issues regarding the extradition treaty that added concerns about violations of the specialty doctrine. At that hearing, the trial court rejected the motion. Thereafter, the Commonwealth and Luna Contreras entered into a plea agreement. The agreement required him to plead guilty to felony murder pursuant to Code § 18.2-33, but allowed him to preserve all arguments "relating to the extradition of [Luna Contreras] and/or treaty between the United States and Guatemala . . ." The resulting sentence would be 20 years of incarceration, with 15 years and 4 months suspended, conditioned on good behavior for 20 years. The Commonwealth would rely on the driving while suspended crime as the predicate for the felony murder charge, since his license was revoked based on two previous DUI convictions.

The trial court swore in Luna Contreras, verified that he understood the agreement, accepted the plea agreement, and sentenced him accordingly. It entered a final order on November 12, 2024. He now appeals.

## II. ANALYSIS

### A. The Sufficiency of the Warrant as the Basis for Extradition (Assignment of Error 1)

The most significant assignment of error for this case stems from the claim that Luna Contreras was prosecuted based on a violation of a bilateral extradition treaty between the United States and Guatemala. "It is . . . very clear that . . . it was not intended that this [extradition] treaty should be used for any other purpose than to secure the trial of the person extradited for one of the offences enumerated in the treaty." *United States v. Rauscher*, 119 U.S. 407, 420 (1886). The pertinent questions we now review are (a) whether the extradition violated the treaty by relying on an offence not enumerated in the treaty, and (b) whether, even if it did violate the treaty, this Court ought to defer to the courts of Guatemala by honoring their determination that the extradition was appropriate. Because the latter is dispositive, we begin the analysis there.

- 4 -

International treaties in which the United States is a party are the supreme law of the land and all judges are bound by them. U.S. Const. art. 6, cl. 2. "[A] treaty is 'equivalent to an act of legislature,' and hence self-executing, when it 'operates of itself without the aid of any legislative provision.'" *Medellin v. Texas*, 552 U.S. 491, 505 (2008) (quoting *Foster v. Neilson*, 27 U.S. 253, 315 (1829)). "Treaties of extradition are deemed self-executing and therefore equivalent to an act of legislature." M. Cherif Bassiouni, *International Extradition: United States Law and Practice* 35 (3d ed. 1996) (quoted in *Cheung v. United States*, 213 F.3d 82, 93 (2nd Cir. 2000)).

"Where an issue 'turns entirely upon a question of law, we review the circuit court's decision de novo.'" *Heald v. Rappohannock Elec. Coop.*, 80 Va. App. 53, 74 (2024) (quoting *Heron v. Transp. Cas. Ins. Co.*, 274 Va. 534, 538 (2007)). "To the extent the Court's analysis involves statutory interpretation, questions of statutory construction are also reviewed under a de novo standard." *Rosson v. Erie Ins. Exch.*, 79 Va. App. 266, 277 (2023) (quoting *Ruderman v. Pritchard*, 76 Va. App. 295, 302 (2022)); *see also United States v. Merit*, 962 F.2d 917, 919 (9th Cir. 1992) ("We review de novo questions regarding interpretation of, and jurisdiction under, the [extradition] treaty, including compliance with dual criminality and specialty requirements.").

Luna Contreras argues that felony murder as articulated in Virginia statute is not included in the enumerated crimes upon which one may be permissibly extradited from Guatemala, partly because he believes the enumerated homicides all involve a malice element that felony murder does not have. Though there is no Virginia or Fourth Circuit federal precedent addressing the specific facts of this case, deferential principles pervading international law and applied in other United States jurisdictions indicate that we ought to take Guatemala's judgment as controlling on this issue. Even if Virginia's felony murder statute did not fit within the meaning of the Treaty, we are obligated to defer to the judgment of authorities in Guatemala.

There is a long tradition across jurisdictions of giving deference to the asylum country's judgment in extraditing a person. This deference is related to the purposes of extradition treaties, as illustrated in *Rauscher* and elsewhere. "[A]n explicit purpose of the treaty in *Rauscher* was to govern 'the giving up of criminals, fugitives from justice in certain cases.'" *United States v. Jimenez-Nava*, 243 F.3d 192, 197 (5th Cir. 2001). "Further, courts have consistently analyzed alleged extradition treaty violations as jurisdictional challenges." *United States v. Saccoccia*, 18 F.3d 795, 801 (9th Cir. 1994). "[I]t is impossible to conceive of the exercise of jurisdiction in [an extradition] case for any other purpose than that mentioned in the treaty . . . without an implication of fraud upon the rights of the party extradited, and of *bad faith to the country which permitted his extradition*." *Rauscher*, 119 U.S. at 422 (emphasis added).

On that jurisdictional issue, "the question of whether an extradition treaty allows prosecution for a particular crime that is specified in the extradition request is a matter for the extraditing country to determine." *United States v. Campbell*, 300 F.3d 202, 209 (2nd Cir. 2002). "[O]ur courts cannot second-guess another country's grant of extradition to the United States." *Id.* While there is no case precedent in the federal Fourth Circuit regarding this question, *Campbell* has been cited favorably on these issues by the Second, Fifth, Eighth, Ninth, and D.C. Circuit Courts of Appeals. *See United States v. Bout*, 731 F.3d 233 (2nd Cir. 2013); *United States v. Frankel*, 443 Fed. Appx. 603 (2nd Cir. 2011); *United States v. Wharten*, 320 F.3d 526 (5th Cir. 2003); *Graham v. Young*, 886 F.3d 700 (8th Cir. 2018); *Benitez v. Garcia*, 449 F.3d 971 (9th Cir. 2006); *United States v. Trabelsi*, 845 F.3d 1181 (D.C. Cir. 2017). Further, according to the United States Supreme Court, "[w]hether the crime came within the provision of the treaty was a matter for the decision of the [extraditing country's] authorities." *Johnson v. Browne*, 205 U.S. 309, 316 (1907). Finally, "we hold that there is no basis to conclude that [the asylum country] was or had reason to be offended by

this prosecution and, hence, this prosecution does not constitute a breach of the treaty provisions." *United States v. Kaufman*, 858 F.2d 994, 1009 (5th Cir. 1988).

Freedoms and limitations surrounding the extradition process are not haphazard; rather they are based on well-established principles. The principle of specialty protects both the extradited person and the sovereignty of the asylum country.[2] *See Rauscher*, 119 U.S. at 422 (explaining that the principle prohibits prosecution of any crime other than that upon which a person was extradited so as to avoid "fraud upon the rights of the party extradited" and "bad faith to the country which permitted his extradition"). The principle of dual criminality protects strong international relations by ensuring that the conduct for which a person is extradited is criminal in both the asylum country and the requesting country. *See United States v. Soto-Barraza*, 947 F.3d 1111, 1117 (9th Cir. 2020) ("[T]he '"essential character" of the acts criminalized by the laws of each country' must be the same, and the laws 'substantially analogous.'" (quoting *Manta v. Chertoff*, 518 F.3d 1134, 1141 (9th Cir. 2008))). The principle of non-inquiry, "shaped by concerns about institutional competence and by notions of separation of powers," prevents courts from "investigating the fairness of a requesting nation's justice system." *United States v. Lui Kin-Hong*, 110 F.3d 103, 111 (1st Cir. 1997).

More importantly here, the principle of comity and the presumption of regularity limit the ability of a requesting country to challenge the propriety of the asylum country's decision to extradite a person. "U.S. courts will defer to the judgment of foreign courts construing their own laws . . . . International comity remains important in this context." *Trabelsi*, 845 F.3d at 1192-93. "It could hardly promote harmony to request a grant of extradition and then, after extradition is granted, have the requesting nation take the stance that the extraditing nation was wrong to grant the request." *Campbell*, 300 F.3d at 209. When a person is "extradited on the basis of comity between

---

[2] Luna Contreras relies on this principle in an assignment of error addressed below.

nations," "[t]he purpose of the rule . . . is to preserve the requesting nation from a breach of faith against the requested nation." *Kaufman*, 858 F.2d at 1008.

Our own Supreme Court has recognized international comity as "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." *Oehl v. Oehl*, 221 Va. 618, 622 (1980). "Virginia courts should grant comity to any order of a foreign court of competent jurisdiction, entered in accordance with the procedural and substantive law prevailing in its judicatory domain, when that law, in terms of moral standards, societal values, personal rights, and public policy, is reasonably comparable to that of Virginia." *Id.* at 623. The comparable law in Virginia would be those statutes governing *its* extradition procedures as the asylum state. According to Virginia statute, "The guilt or innocence of the accused as to the crime of which he is charged may not be inquired into by the Governor or in any proceeding after the demand for extradition . . . except as it may be involved in identifying the person held as the person charged with the crime." Code § 19.2-106. Rather, the relevant information to be ascertained by the Governor is "that the accused was present in the demanding state at the time of the commission of the alleged crime and that thereafter he fled from such state." Code § 19.2-87. The only documentation required is an authenticated "indictment, information or affidavit made before the magistrate [that] must substantially charge the person demanded with having committed a crime under the law of that state." *Id.* As the Virginia Extradition Manual plainly states, in the review for legal sufficiency "[t]wo crucial things are looked for: 1) whether the fugitive is, in fact, charged with a crime in the demanding state; and 2) whether the person arrested is the fugitive." Secretary of the Commonwealth of Virginia, *Virginia Extradition Manual* 6 (2025). Further, "[t]he Governor's office will not examine issues of probable cause for the charge. Nor will it consider other

- 8 -

defenses such as alibi or self[-]defense.  These issues are considered matters between the fugitive and the demanding state."  *Id.*

The presumption of regularity, in our own and other jurisdictions, bolsters considerations of comity and affirms the need for inter-governmental deference.  "The presumption of regularity is founded on inter-branch and inter-governmental comity, not our own judicial expertise with the relevant government conduct."  *Latif v. Obama*, 677 F.3d 1175, 1182 (D.C. Cir. 2012). Similarly to the United States Supreme Court's determination upon petition for habeas corpus that "[p]rima facie[, the petitioner is] in lawful custody and upon him rest[s] the burden of overcoming this presumption by proof," it has also concluded that "collateral review of an international extradition order should begin with the presumption that both the order and the related custody of the fugitive are lawful."  *Skaftouros v. United States*, 667 F.3d 144, 158 (2nd Cir. 2011) (alterations in original).  In the face of challenges to the proceedings of a committee of a foreign legislative assembly, the United States Supreme Court has said, "the nature of the investigation, the purposes for which the committee was appointed, and the fact that the appellant appeared before it without objection would warrant a presumption of regularity in a summary proceeding like this."  *Kelly v. Griffin*, 241 U.S. 6, 14 (1916).  The same Court has also been willing to recognize foreign documents remote in both geography and time upon such a presumption.  *See McGuire v. Blount*, 199 U.S. 142, 146 (1905) (saying of 85-year-old Spanish documents that the authority upon which they were created "is presumed to be legitimate and regularly exercised").

Courts of our own jurisdiction affirm the general presumption.  "We also apply a presumption that public officials have acted correctly."  *Hladys v. Commonwealth*, 235 Va. 145, 148 (1988); *see also McNally v. Va. Dep't of Motor Vehicles*, 80 Va. App. 483, 525-26 (2024); *KSS One, LLC v. Henrico Cnty.*, 76 Va. App. 770, 784 (2023).  "That presumption may be

overcome by evidence of bias or improper conduct." *Hladys*, 235 Va. at 148. "Without a showing to the contrary, state administrators 'are assumed to be men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances.'" *Id.* (quoting *Withrow v. Larkin*, 421 U.S. 35, 55 (1975)).

We agree with the foregoing authority. The Commonwealth, in partnership with the U.S. Department of Justice and Department of State, submitted a request for extradition based on its citation of the Code and its description of the crime. Guatemalan authorities made the decision to extradite Luna Contreras with that knowledge. The transfer documents submitted by Guatemalan legal counsel to Guatemalan officials and judges cited Code § 18.2-33. The United States petitioned for extradition by submitting a warrant with corresponding affidavit, signed by relevant state and national authorities. All of these procedures are analogous to Virginia's own statutory standards for extradition. They also form a sufficient basis for our deference toward the processes by which Guatemala extradited Luna Contreras. We should not challenge the decision of a foreign authority, especially when courts in our own country have historically given deference to such authorities. As such, we are bound to give deference to the asylum country, and we need not address the propriety of the extradition based on the language of the treaty.

B. Proving the Predicate Felony Without a Corresponding Charge (Assignments of Error 2 & 3)

Luna Contreras argues that because felony murder requires proof of a predicate crime, his extradition was based on a "hybrid charge" that included a non-extraditable offense. As the Commonwealth concedes, "we have to prove that there was another felony committed, but we don't have to have a charge for that." The argument continues, "[t]he underlying felony that must be proven . . ., none of which are extraditable offenses on their own, requires the prosecution to prove as a material element an offense that the Treaty does not authorize."

We fail to see any problem, or even a clear argument by Luna Contreras. If, as some of our case law suggests, second-degree felony murder pursuant to Code § 18.2-33 involves the implicit "imputation" of malice, then conviction of that crime involves malice and it conforms to the federal definition of murder. *See Flanders v. Commonwealth*, 298 Va. 345, 357 (2020); 18 U.S.C. § 1111. Given this, Luna Contreras is either challenging the extradition because it is for a "hybrid charge"—meaning the charge inherently involves conviction for two crimes—or he is challenging the felony murder conviction because he believes it must be based on a predicate, separate criminal conviction. If the latter, the issue was not preserved at the trial court, and in fact was waived by consent to the plea agreement where Luna Contreras pleaded guilty to the crime. "[Defendant's] argument to the contrary seems oblivious to the fact that he entered into a plea agreement in which he stipulated to [his sentence] . . . ." *Jones v. Commonwealth*, 293 Va. 29, 44 (2017). "Virginia has long held that a criminal defendant can waive 'his appeal of right' if the circumstances demonstrate 'his decision to waive his appeal was made knowingly, voluntarily, and intelligently.'" *Id.* (quoting *Davidson v. Commonwealth*, 244 Va. 129, 131 (1992)). Here, the trial court ensured that Luna Contreras understood the decision he was making when he signed the conditional plea agreement and the only appealable issues related to the extradition, not the conviction.

If the former, the argument is unclear. Virginia's felony murder statute is not a "hybrid charge." It has elements like any other crime, though it happens to be that one of the elements could also form the basis of a different criminal conviction. But the Commonwealth did not pursue conviction on the predicate crimes. Further, Luna Contreras does not point to anything in the Treaty limiting the elements in number or kind that are necessary to prove the extraditable offense. Thus, there is no argument with enough support to justify further discussion of this issue.

C.  The Doctrine of Specialty (Assignments of Error 4-6)

Luna Contreras claims that the language in the warrant upon which he was extradited is different enough from the statutory language of the crime for which he was convicted that the trial court violated the doctrine of specialty.  The doctrine of specialty, "prohibit[s] the prosecution of [a] defendant . . . for a crime other than the crime for which he had been extradited."  *United States v. Alvarez-Machain*, 504 U.S. 655, 659 (1992).  We reject the argument made by Luna Contreras.

Before addressing the issue in substance, we should clarify the facts on record.  Luna Contreras has repeatedly argued in the trial court and on brief that the warrant upon which he was extradited states "accidentally kill and murder" as the relevant offense.  Peppered throughout these arguments is the starkly different wording of the warrant cited by the trial court, the Commonwealth, and counsel for Luna Contreras himself.  The language of the warrant is much closer to the statute than we are led to believe.  Compare:

> Warrant: "[A]ccidentally kill and murder Jonathan Rios Perez in the second degree while in the commission of a felony."

> Indictment: "[U]nlawfully, unintentionally, accidentally, and feloniously kill Jonathan Rios Perez while committing a felonious act . . . in violation of § 18.2-33 . . . ."

> Statute: "The killing of one accidentally . . . while in the prosecution of some felonious act . . . is murder in the second degree . . . ." Code § 18.2-33.

From the one sentence descriptions in both the warrant and the statute, we can see that the prepositional phrase "in the second degree" modifies the word "murder."

Luna Contreras' argument rests on a few ambiguities in the language of the warrant that would admit of a departure of interpretation from the statute.[3]  First is whether "in the second

---

[3] We address only two here, but will cover a third below produced by the difference between "commission" and "prosecution."  *See infra* at 15-16.

degree" modifies only the word "murder" or both the words "kill" and "murder." Second is whether accidentally killing while in the commission of a felony *equates* to second degree murder or whether "accidentally killing" and "murder in the second degree" occurred simultaneously during the commission of a felony. Yet, possible interpretations do not entail plausible interpretations. Here, considering that the warrant cites Code § 18.2-33 as the basis for the explanation of the offense, it would be implausible to take the latter interpretations of the warrant on either ambiguity. Clarity is not diminished by the magistrate's paraphrase of the statute. Its meaning entails that Luna Contreras killed in the commission of a felony and, therefore, murdered in the second degree.[4]

According to the argument by Luna Contreras, "This warrant does not state an offense in Virginia. You can accidentally kill a human being; that is not a crime." "[T]he change between the arrest warrant used to extradite Luna Contreras to the USA from Guatemala *which does not state an offense* to the indictment *which states an offense* also violates the doctrine of specialty and thus violates the Treaty." (Emphases added). This argument complains of a switch between a *non-offense* in the warrant to an *offense* in the indictment. Yet, Luna Contreras can only make this claim of non-offense if he endorses the misrepresentation of the record addressed above. To "accidentally kill a human being" or "accidentally kill and murder" are very different from "accidentally killing a human being while in the commission of a felony." The first two renderings are not crimes, while the third fits Code § 18.2-33. But the first two renderings are inaccurate. Since the warrant does state an offense, then there is no change from non-offense to offense in the warrant and indictment, and the specialty doctrine is not violated in that respect.

---

[4] In light of these considerations, the argument by Luna Contreras reduces to a complaint about the difference in language between "commission" (in the warrant and indictment) and "prosecution" (in the statute) of the felonious act, which will be addressed further below. *See infra* Section D.

In a second attempt at the specialty argument, Luna Contreras claims that even if the warrant does state an offense upon which he can be extradited, the change in language from the warrant to the indictment to the statute is "material" and supports a finding that the prosecution violated the specialty doctrine. The trial court found no such violation, since the warrant, the indictment, and the conviction all cite Code § 18.2-33.

It is permissible for the language to be slightly different in a warrant and indictment. The Ninth Circuit, for example, has concluded that there is no violation of the specialty doctrine when the extradited person is convicted of additional counts of the same crime. *United States v. Andonian*, 29 F.3d 1432, 1437 (9th Cir. 1994). The Fifth Circuit stated further that even though "[t]he different descriptions of the counts in the indictment and the charges in the [r]esolution [of extradition] created confusion regarding the counts on which [the defendant] could be prosecuted," precedent cases "suggest that the doctrine of specialty is concerned primarily with prosecution for different substantive offenses than those for which consent has been given . . . ." *United States v. LeBaron*, 156 F.3d 621, 626-27 (5th Cir. 1998). Finally, the Eleventh Circuit has explained that "[r]ather than mandating exact uniformity between the charges set forth in the extradition request and the actual indictment, '[w]hat the doctrine of specialty requires is that the prosecution be based on the same facts as those set forth in the request for extradition.'" *Marquez v. United States*, 684 Fed. Appx. 843, 856 (11th Cir. 2017) (alterations in original) (quoting *Gallo-Chamorro v. United States*, 233 F.3d 1298, 1305 (11th Cir. 2000)).

Luna Contreras has not cited any misrepresentation in the facts given to Guatemala nor any theory as to why the changes in language between the warrant, indictment, and statute are "material." Taking cues from our own law, Virginia allows changes to indictments so long as they do not "change the nature or character of the offense charged." Code § 19.2-231. This Court has held, for example, that a difference in description of the facts that does not affect the basis of the

conviction is permissible, even when it may change the sentence. *See Dunaway v. Commonwealth*, 52 Va. App. 281, 297 (2008). In contrast, if the indictment fails to state a crime for which the defendant will be convicted, it is a material change. *See Grier v. Commonwealth*, 35 Va. App. 560, 568 (2001). We cannot find any justification to assert that the language change was "material."

### D. Non-Offense in the Warrant or Indictment (Assignments of Error 7-9)

Luna Contreras argues that the warrant and indictment state a non-offense in Virginia law. This is in part because of the misrepresentation in language we have already addressed above. *See supra* Section C. However, he also bases this argument on the fact that while the statute uses the word "prosecution" of a felonious act, both the warrant and indictment use the word "commission." This argument also lacks merit.

Were we to grant every claim Luna Contreras makes about the legal difference between "commission" and "prosecution," it would not support his argument. He observes that "even *Flanders* imagines situations broader than the 'commission of a felony' to be part of the res gestae of the underlying felony to determine if the accidental homicide is in the 'prosecution' of the felony." *See Flanders*, 298 Va. at 345. This does not help his case. If "commission" of a felony is narrower than "prosecution" of a felony, then showing that Luna Contreras killed someone in the *commission* of a felony entails that he killed someone in the *prosecution* of a felony.

More importantly, though, the discussion in *Flanders* pertains to the "two-step inquiry" of (a) what felonious acts can serve as predicates to Code § 18.2-33 felony murder, and (b) whether the death falls within the *res gestae* of the felonious act. *Id.* at 352-53. As to the first step, Luna Contreras has not preserved any objection, as discussed above. *See supra* at 12. As to the second step, the injury to the deceased passenger occurred during and because of the

felonious acts of Luna Contreras. The resultant death occurred with the proper "time, place, and causal connection." *Flanders*, 298 Va. at 360. The *res gestae* is not in dispute.

Luna Contreras attempts to use the *res gestae* argument to show that the warrant and indictment cite a non-offense. But the failure of this argument should be apparent by now. Though *Flanders* does trace the history of murder and homicide laws in Virginia, it does not pit the words "commission" and "prosecution" against each other or even note a difference between them. *See id.* at 352-53. In fact, the discussion about the statutory language tends to work against Luna Contreras' theory. "[T]he *res gestae* of the underlying crime begins where an indictable attempt to commit the felony is reached and ends where the chain of events between the attempted crime or completed felony is broken." *Id.* at 361 (quoting *Berkeley v. Commonwealth*, 19 Va. App. 279, 286 (1994)). This passage shows that the word "commit" can be used interchangeably with the word "prosecute." It also shows that the killing was well within the *res gestae* of Luna Contreras' felonious acts and that the warrant and indictment adequately describe the law under which he was extradited and convicted.

## III. CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.

*Affirmed.*